[No. A121763. First Dist., Div. Two. Apr. 13, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
YVONNE CHAPPELONE, Defendant and Appellant.

[No. A121764. First Dist., Div. Two. Apr. 13, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CHAPPELONE, Defendant and Appellant.

## COUNSEL

Oliver J. Northup, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Yvonne Chappelone.

Sara Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant Michael Chappelone.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Margo J. Yu, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHMAN, J.**—At first blush, this appeal presents what appears to be a relatively straightforward issue: did the trial court properly calculate the

amount of restitution owed by husband and wife defendants Yvonne and Michael Chappelone for the theft of a large quantity of retail merchandise from Yvonne's employer, Target? Upon closer examination, however, this appeal presents numerous complexities, such as how to value merchandise that was already damaged prior to the theft; whether the merchandise should be valued at its retail or wholesale price; and whether the calculation should be based on the diminution in value of the merchandise since the bulk of it was recovered by Target. The trial court grappled with these and other questions and, following a contested restitution hearing, ordered defendants to pay restitution in the amount of $278,678.

Defendants contend that (1) the court abused its discretion in calculating the amount of restitution owed and (2) the restitution order violated their Sixth Amendment right to a jury trial. We conclude that their first argument has merit, but the second does not. We thus reverse and remand, but not for a jury trial.

## BACKGROUND

### 1. *The Embezzlement*

In 2004, Yvonne[1] began employment at the Vallejo location of Target, a nationwide retail store that sells a wide range of consumer goods. Initially, she worked at night, restocking shelves and returning items to their proper locations. In April 2006, she was promoted to "reverse logistics," where she was responsible for seeing that damaged items and merchandise withdrawn by manufacturers were returned to the appropriate entity for credit or otherwise disposed of. Yvonne had to remove some items from the sales floor, while others were already in the stockroom. All of the items were then sorted onto pallets in the stockroom pending disposition.

Yvonne and Shawne Camp, an investigator in Target's assets protection department and the primary witness for Target at the restitution hearing, both testified regarding the pallet system. Although the system is not entirely clear from their testimony, this is how they described it:

The merchandise for which Yvonne was responsible was divided into three categories, yellow-tagged, green-tagged, and red-tagged items, with a separate pallet designated for each category. Yellow-tagged items—or "CRC's"—were items that were damaged in transit to Target or returned by customers because they did not work when purchased. The customer was issued a full

---

[1] When we refer to defendants individually, we will refer to them by their first names, to avoid confusion. When we refer to them collectively, we will call them "defendants."

refund or replacement, and the item, which still had a dollar value, was returned to the stockroom to be placed on the yellow pallet. Those goods were then shipped to a central location and, from there, returned to the vendors, who issued a credit to Target. Examples of items that would be yellow-tagged included televisions, videos, and DVD's.

Camp explained yellow-tagged items this way: "Yellow, that would be what we call CRC, so when a guest or a customer brings something back, such as an iPod to Target and they say 'I bought this iPod, it doesn't work,' they are given a refund or given a new iPod. That iPod still has a dollar value to it, so the disposition—a disposition is given automatically by the computer by the employee that's doing the return on that iPod. A disposition would be given to that item of a yellow label, meaning that a yellow label would be placed on that iPod. That then signifies once it gets back to the stock in the back stockroom area, that that iPod is to go on a particular pallet, which is called the CRC pallet. [¶] We then conduct sweeps where a trailer that brought merchandise into Target would be loaded with these pallets that are supposed to go back to CRC, which I believe is in Indianapolis. So that iPod eventually would be loaded back onto a trailer and sent to CRC in Indianapolis, where we would receive full credit back from the vendor." Yellow-tagged items were typically the most valuable of the three pallets.

Green-tagged merchandise was considered salvage, typically consisting of items or sets that were missing components when purchased, as well as clearance items that had been reduced to up to 90 percent off but still did not sell and were thus withdrawn from the sales floor. These items were "donated" to a charity for 30 cents on the dollar of the last retail price. Some green-tagged items, such as vitamins and food, could not be donated for any money, and were simply given away at a total loss to Target.

Camp gave the following example of green-tagged items: "An example of that would be if somebody brought in . . . [a] toy, if somebody brought in a box of Legos that maybe retails for a hundred dollars, and they said that, you know, it was missing some of the pieces when they got it, that item then can be given a green label meaning salvage. [¶] So once that item is taken from the service desk, it would be brought to the back room, and it would be placed on another pallet beside that CRC pallet that would be considered a salvage pallet. That's stuff that we then donate to like the Goodwill. But when I say 'donate,' it's not given free of cost." Instead, as noted, Target received 30 cents on the dollar of the last retail price. Camp further detailed the green-tagged items that Target could not dispose of for any money: "There's specific items that we are not allowed to donate for a profit where we just have to donate them free of cost. That—those items would be things like vitamins and cereals, foods, pretty much any type of food, except for

liquor—we cannot donate liquor. But that would be something that we would have to set up a separate donations place, so maybe like a women's—a battered women's shelter or something, and we just give them all these vitamins, and there is no 30 cents on the dollar for that."

The third pallet was for red-tagged items, which included damaged merchandise that could not be sold and no longer had any financial value to Target. These would include things such as diapers, food items, cosmetics, toiletries, toilet paper, household products, small appliances, glassware, flatware, and clothing. As another example, if a camcorder was removed from a box to be used as a display item, the box would be returned to the stockroom where Yvonne would red-tag it. When asked about more expensive items, like an electronic item missing a charger, Yvonne explained, "If something is minus 50 percent and it should go back to CRC, it's going to be overridden and red-tagged." Red-tagged items were the least valuable of the three pallets.

In addition to the yellow-, green-, and red-tagged items, the pallets also occasionally included new merchandise that nighttime employees transferred from the front of the store to the stockroom. Yvonne was responsible for removing the new merchandise from the pallets and returning it to the sales floor.

In addition to seeing that yellow-tagged merchandise was shipped out to CRC for return to vendors, Yvonne's responsibilities also included disposing of green- and red-tagged goods, that is, damaged or otherwise unsellable items that could not be returned to the merchandisers. Target had an arrangement with Goodwill Industries, a nonprofit organization that would take all of the unsellable merchandise, paying Target 30 cents on the dollar for the items. At a certain point, however, the Goodwill pickups became unreliable, and when Yvonne reported this problem to her manager, he advised her to find an alternative way to dispose of the merchandise. Yvonne contacted a number of charities, but no one was willing to accept all of the merchandise, instead wanting first to look through the items and pick out just what they would like.

To help Yvonne, Michael spoke with Thomas Clarke, an acquaintance who volunteered with the Rotary Club, a charitable organization that performs community service. Clarke agreed to accept the merchandise on behalf of the Rotary Club and distribute it to various nonprofits. Because the Rotary Club lacked the capacity to transport and store the volume of merchandise that was available for distribution, Michael would pick it up from Target in his trailer and take it home, and Clarke would retrieve it from there and distribute it. According to Yvonne, her manager was present on multiple occasions when Michael picked up the items.

In June 2006, shortly after Yvonne's promotion, Target received a phone tip reporting that Yvonne was stealing merchandise. A surveillance of Yvonne failed to turn up anything out of the ordinary.

In May 2007, Target received a second such tip. The store began another surveillance, this time uncovering a massive theft. An investigator initially observed Michael drive a trailer onto Target property, load it with merchandise, and drive away. The trailer was traced to defendants, so investigators began watching their home in American Canyon, where they were observed loading merchandise into a sports utility vehicle. The investigators did not intercept them, however, and instead followed Yvonne as she drove the vehicle to Oregon.

Once in Oregon, Yvonne first stopped at a residence later determined to belong to her daughter. She then continued on to a second residence that belonged to her mother, Barbara Beattie. On Beattie's property, there was a main home, a second home, and a barn with an additional storage area attached. A search of the buildings uncovered a small amount of Target merchandise in the main home. In the second home, the upper floor was set up like a showroom, displaying living room and dining room merchandise. Many of the items had Target price tags or were brands carried by Target. Investigators also discovered shelves lined with toiletries, some bearing a clearance label used by Target when it reduced the price of an item.

The barn, in which the investigators found a "garage sale" sign, appeared to have been converted into a store full of Target merchandise. There was clothing displayed on hangers and merchandise laid out on long tables. Looking through the items, the investigators determined that much of the merchandise came from Target, since some of the brands were specific to Target and some of the items bore a label or logo indicating it was from a Target store.

Adjacent to the barn was a storage area that contained "totes and totes of merchandise." In front of the barn was an area covered with tarps, under which there was more Target merchandise. Next to the barn was a tentlike area that contained larger Target items, like lawn furniture.

It was subsequently learned that Beattie began receiving merchandise from Yvonne in December 2006 and received it through May 2007, when the theft was discovered. During that time, she held three or four garage sales to dispose of merchandise, earning $3,000 in her estimate. Of that, she gave Yvonne approximately $1,500.

Investigators also searched defendants' home in American Canyon. There, they discovered Target merchandise in the house, garage, and a camper on the

property. They also recovered Target merchandise, including lawn furniture and bicycles, from a storage unit in Vallejo. At Yvonne's daughter's Oregon residence, they discovered Target merchandise in the house, garage, and an attached storage area.

Defendants were arrested and the merchandise seized. The items recovered in California were transferred to a rented storage unit near defendants' home. The Oregon merchandise was loaded into semitrucks and transported to a Target distribution center in Oregon, where it was held until it could be inventoried. Eventually, per FBI instructions to retain the merchandise, it was consolidated at a Target distribution center outside of Sacramento and stored in rental trailers pending resolution of the case.

### 2. The Criminal Proceedings

By amended felony complaint filed May 18, 2007, the Solano County District Attorney charged defendants with one count of conspiracy to commit grand theft, burglary, and receiving stolen property (count 1; Pen. Code, § 182);[2] one count of grand theft by embezzlement (count 2; § 487, subd. (a)); and two counts of receiving stolen property (counts 7 and 8; § 496, subd. (a)). Yvonne was additionally charged with four counts of second degree commercial burglary (counts 3–6).

On November 15, 2007, Michael pleaded no contest to the conspiracy charge, and Yvonne pleaded guilty to the conspiracy and grand theft charges.[3] The remaining charges were dismissed with a Harvey[4] waiver.

On April 16, 2008, the court suspended imposition of sentence and placed defendants on five years' probation, with Yvonne to serve 365 days and Michael 210 days in county jail under the sheriff's alternative program. Both were ordered to pay a restitution fee of $220, a probation fee of $300, and a court security fee of $20, as well as restitution to Target in an amount to be determined by the court. Following a contested restitution hearing—described in detail below—the court ordered defendants to pay restitution to Target in the amount of $278,678, subject to an offset should Target receive anything of value for the recovered merchandise. Defendants immediately presented a check for $5,000 to demonstrate their good faith intent to make restitution to Target.

The court scheduled a hearing for May 15, 2008, for a progress report, but subsequently took the matter off calendar and ordered the parties to work

---

[2] All statutory references are to the Penal Code.

[3] Beattie also faced charges and ultimately entered a no contest plea in her case.

[4] People v. Harvey (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396].

with the probation department to determine any offset resulting from Target's disposition of the recovered property.

Defendants appealed from the April 16, 2008 order of restitution.[5]

At a September 10, 2009 hearing before the trial court, Target's investigator Camp confirmed that with the exception of wine that was thrown away, all of the merchandise was donated to charitable organizations at a total loss to Target. He also confirmed that Target neither sought nor received a tax credit for the donations.

### 3. *The Restitution Hearing*

At the outset of the restitution hearing, the prosecutor stated that the People were seeking restitution in the amount of $616,223. This amount included merchandise valued at $554,118, which was based on an extrapolation prepared at Target headquarters that looked at shortages in Target stores comparable to the Vallejo store for the years 2005, 2006, and 2007. Fifty percent of the shortages, or $554,118, was attributed to Yvonne.

Alternatively, the prosecutor sought to establish that at a minimum Target was entitled to $278,678, which was comprised of $234,185 for the merchandise, $15,191 for inventory services and investigation expenses, and $29,302 for transporting and storing the recovered goods. Camp, the Target investigator, explained how Target arrived at these numbers. As to the value of the merchandise, he explained that Target retained RGIS, a national inventory service, to inventory the merchandise. RGIS scanned every single item that was recovered and produced an inventory listing each item and a corresponding dollar amount for it. When scanning, RGIS did not differentiate between items that were new or damaged and, if damaged, whether they would have been yellow-, green-, or red-tagged. Instead, all items were scanned at their last retail value. The total value of the recovered merchandise based on that method was $234,185, which included $72,342 in merchandise recovered from defendants' home and $161,843 recovered from Oregon. The inventory did not include the merchandise that Yvonne's mother sold at the garage sales or that had been given to the Rotary Club. However, the inventory did

---

[5] After the matter was fully briefed, we sent a letter to all parties concerning the appealability of the restitution order, inquiring as follows: "The Court . . . notes that the record indicates that at the time of the restitution order, the ultimate amount of loss to Target was not yet determined because disposal of the recovered merchandise was still pending. The Court has formed the opinion that these circumstances might make the order appealed from an interlocutory order. The Court would therefore like you to brief whether the order appealed from is an appealable order. . . . Counsel are encouraged to provide to the Court any information about subsequent developments concerning the restitution matter not reflected in the record, particularly any offset Target might have received from disposal of the merchandise."

include, in Yvonne's approximation, $4,000 worth of items seized from her house that belonged to her and had not been stolen from Target.

Camp also testified that Target expended $15,191 for RGIS's services as well as investigation expenses. The latter included travel expenses for Target investigators while in Oregon, including rental cars, hotel rooms, and meals.

Additionally, Camp explained that per FBI instructions, Target was required to retain the recovered merchandise until the case was resolved. After RGIS completed its inventory, the merchandise was transported to a single distribution center outside of Sacramento. Lacking the capacity to store such a large quantity of merchandise indefinitely, Target leased six semitrailers at $1,877 per month to store the merchandise pending disposition. The charges for transporting the goods and the storage trailers totaled $29,302, which included rental costs through February 2008.

At the time of the restitution hearing, Camp could not say with certainty what Target was going to do with the recovered merchandise. He was certain, however, that none of it was going to be returned to the sales floor, and thought it likely that Target would donate it all and take a tax writeoff.

Yvonne also testified at the hearing. In addition to describing her job responsibilities and the pallet system, she admitted that at the time unsellable goods were being given to the Rotary Club, she began appropriating goods from the stockroom, some of which she took to Oregon and some of which she kept at home. Most of the goods, according to Yvonne, were green- or red-tagged. She admitted, however, that some of the items were new, having been placed on the stockroom pallets by the night crew.

When asked for her estimate of the value of the merchandise she stole, Yvonne responded that the full retail value was $200,000. Because much of the merchandise was unsellable, however, she estimated its actual value to Target to be $25,000 to $30,000.

Clarke from the Rotary Club also testified. When asked about the condition of the merchandise he received, he explained: "[M]ost of the stuff would have a green label on it, be salvage. Some of the stuff was broken. Sometimes there would be—if there was a dinner set or something, a dish would be busted [*sic*] in there, and it wouldn't be a full thing. Some things we got were out of date, obviously, because like when we'd be putting toys together for Christmas, we'd be getting—Halloween stuff would come through there. . . . I'd call it a grab bag. I mean, you'd open a box and see what's in there. Sometimes there could be—there could be some shampoo or soap, but you could tell there's something leaking." Beattie's description of the merchandise was consistent: the items were "missing things, they're broken," "everything was damaged."

Following testimony, the court heard argument. The People reiterated their request for restitution based on Target headquarters' extrapolation, this time asking for $594,611. They derived this number by deducting $4,000 for Yvonne's property that was mistakenly confiscated and $17,612 in employee payroll costs, both of which were included in the original $616,223.

In contrast, defense counsel urged the court to value the merchandise in the range of $25,000 to $50,000, based on what the merchandise was worth when it was stolen. He argued that the merchandise was worth significantly less than the $234,185 claimed by Target since much of it was damaged prior to the theft and would have been donated. While he conceded the $15,191 investigation expense, he challenged the $29,302 for transportation and trailer rental, arguing the merchandise could have been stored elsewhere or dealt with in a more reasonable manner.

Alternatively, defense counsel argued that if the court was going to order restitution of approximately $234,000 for the merchandise, which was the full value of the goods based on the RGIS inventory, such an order necessarily meant that the recovered merchandise had no value to Target. If so, he requested that it be released to defendants to sell to help with the restitution order. The court summarily rejected that suggestion.

At the conclusion of the hearing, the court rejected the prosecutor's request for $554,118 for the merchandise based on the extrapolation, labeling it "too speculative." The court then ordered restitution as follows: "I'm going to make a finding that basically the storage costs in this case are reasonable as related to appropriate investigation in this case. It may not be a perfect investigation and not an austere one from the defense view, but I think it's appropriate, and I'll make a finding that the cost of reasonable and related investigative endeavors are compensable in a restitution order. I think generally the conduct of Target and its various agents were reasonable in this case and their expenses are reasonable. So, basically, I'm going to award those. [¶] My order is also going to be that restitution is going to be joint and several as to both defendants. And I am going to order restitution in the amount of $278,678, and I reach that as follows. The reasonable value of the seized property—this is less than what was stolen—but the seized property is $234,185. I'm going to order that. I'm also going to order in addition to that . . . $15,191, and that would be inventory services, rentals, hotels and meals and so forth. In addition to that, $29,302, which is essentially storage costs."

The court also noted that the $4,000 of property seized from defendants' American Canyon home and the $3,000 Beattie made from selling Target merchandise at garage sales was "a wash."

When defense counsel objected that Target's likely plan of donating the merchandise and taking a tax writeoff was at odds with the court awarding full retail value, the court responded, "Not necessarily. They can do whatever they want with it. They can abandon it, for all I care. I've made a finding that I think the reasonable amount of value of that property when your client stole it is over $200,000. . . . [¶] Now, if Target gets some kind of benefit from donating these things, in other words, their tax liability for 2009 is somehow reduced by a hundred thousand dollars because of donation of this stuff, I would consider reducing your clients' restitution liability by that amount . . . ."

Based on Target's representation that it would know "within probably one week" what it was going to do with the merchandise, the court set a hearing for a progress report on May 15, 2008. On that date, however, Target represented that it was still in the process of disposing of the merchandise and did not yet know if it would receive any benefit to offset the restitution amount. It was agreed that from there on out, the probation department would supervise any remaining restitution issues, and the matter was taken off calendar.

As previously noted, Target ultimately donated the merchandise at a total loss and did not claim a tax credit for the donations.

## DISCUSSION

### A. *The Law of Restitution and Standard of Review*

In *People v. Giordano* (2007) 42 Cal.4th 644, 652 [68 Cal.Rptr.3d 51, 170 P.3d 623] (*Giordano*), our Supreme Court summarized the origin of the state's restitution scheme: "In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights. . . . Proposition 8 established the right of crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer.' [Citation.] The initiative added article I, section 28, subdivision (b) to the California Constitution: 'It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary.' "

The *Giordano* court further explained that "California Constitution, article I, section 28, subdivision (b), which is not self-executing, directed the

Legislature to adopt implementing legislation. [Citations.]" (*Giordano, supra,* 42 Cal.4th at p. 654.) Section 1202.4 was the legislative response. In its current incarnation, it provides that "a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Subdivision (f) of section 1202.4 states that, subject to certain exceptions not applicable here, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." Restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).) Subdivision (f)(3)(A) through (K) identifies, without limitation, examples of economic losses that are recoverable by the victim, including losses to property.

(2) A defendant is entitled to a restitution hearing to "dispute the determination of the amount of restitution." (§ 1202.4, subd. (f)(1).) As recently explained, "At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.'" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 [95 Cal.Rptr.3d 751] (*Millard*); see also *Giordano, supra,* 42 Cal.4th at p. 664 ["The burden is on the party seeking restitution to provide an adequate factual basis for the claim."].)

A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall. (*Millard, supra,* 175 Cal.App.4th at p. 28; *In re Anthony M.* (2007) 156 Cal.App.4th 1010, 1017–1018 [67 Cal.Rptr.3d 734].) While the court need not order restitution in the precise amount of loss, it "must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992 [81 Cal.Rptr.2d 886] (*Thygesen*); see also *In re Brian S.* (1982) 130 Cal.App.3d 523, 527 [181 Cal.Rptr. 778] ["court may use any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole and which is consistent with the purpose of rehabilitation"]; *People v. Ortiz* (1997) 53 Cal.App.4th 791, 800 [62 Cal.Rptr.2d 66] ["[W]hile the amount of restitution cannot be arbitrary or capricious, '[t]here

is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action.' "]; *People v. Akins* (2005) 128 Cal.App.4th 1376, 1382 [27 Cal.Rptr.3d 815] [same].)

We review the trial court's restitution order for abuse of discretion. (*Millard, supra,* 175 Cal.App.4th at p. 26; *People v. Akins, supra,* 128 Cal.App.4th at p. 1382; *People v. Baker* (2005) 126 Cal.App.4th 463, 467 [23 Cal.Rptr.3d 871]; *Thygesen, supra,* 69 Cal.App.4th at p. 992.)

> B. *The Court Abused Its Discretion in Ordering Restitution in the Amount of $234,185 for the Stolen Merchandise*

Defendants present numerous arguments challenging the amount of restitution the court ordered them to pay for the stolen merchandise. Some of the arguments are well-taken and warrant reversal.

> 1. *The Trial Court Improperly Awarded Target a Windfall When It Ordered Restitution Based on the Last Retail Price of the Merchandise*

Section 1202.4, subdivision (f)(3)(A) provides that a crime victim is entitled to restitution for the "[f]ull or partial payment for the value of stolen or damaged property." The value "shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible." (*Ibid.*) Defendants contend that here, instead of awarding Target the "replacement cost of like property," the court overcompensated the store by relying on the RGIS inventory, which inflated the value of the merchandise. This is so, they reason, because all items were scanned at their last retail price when their value to Target was in fact significantly less. We agree.

It was undisputed at the restitution hearing that the stolen merchandise included yellow-, green-, and red-tagged items, as well as some new items. According to Yvonne's testimony, most of the items that she appropriated were green- or red-tagged merchandise. Beattie described most of it as "missing things, they're broken," and noted that "everything was damaged." Target investigator Camp testified that the items recovered included some green-tagged, or salvage, merchandise. Finally, Clarke from the Rotary Club described the "grab bag" of damaged goods he received for distribution. Given that the bulk of the goods were unsellable because they were either damaged merchandise or clearance items withdrawn from the sales floor, the retail price of these goods was not reflective of their value to Target.

More specifically, as to the green-tagged items, if it was an item that had been put on clearance but still did not sell, it would have scanned at the last

clearance price. If it was a salvage item because it was missing a component—as were the bulk of the green-tagged items—it would have scanned at the full retail price. These items, however, had been destined for "donation" at 30 cents on the dollar of the last retail price. Consequently, on all such items, Target was awarded a windfall of 70 percent.

Other green-tagged items, such as food and vitamins, were to be given away for free, as were all red-tagged goods. These items scanned at either their full retail or clearance price, even though their value to Target was zero—in effect, a 100 percent windfall.[6]

As a specific example, the inventory included numerous display items. While Target sells some display items (such as camcorders), it does not sell other display items (such as video game consoles). Those unsellable display items would have scanned at their full retail price, even though Target would have donated those goods for 30 cents on the dollar, giving Target a windfall of 70 percent.

The People present multiple arguments in opposition to this conclusion, none of which is persuasive. First and foremost, they protest that it would have been "virtually impossible" to accurately calculate the value of the merchandise: "[I]t would be virtually impossible for Target investigators to determine the value of the property when taken since it cannot be determined, if the property is damaged, whether the item was damaged at the time the property was stolen from Target, or damaged during the handling, transportation, or storage of the goods. Testimony established that the goods were loaded into a truck on the Target premises and transported to the Cappelone's [sic] residence. From there, some of the merchandise was transported to Mr. Clarke's residence, and some to co-defendant's daughter and mother's residences in Oregon. In Oregon, the goods were stored outside under tarps, in the barn, and in the garage and residence for possibly more than a year. There is no method to determine the condition of each item when it left the Target store, unless at the time of recovery, the item was in perfect condition. Even if the item was in perfect condition, it would be impossible to determine when co-defendant stole each piece of property to determine its value at the time of conversion, since products are generally marked down or put on sale over time."

The trial court was clearly cognizant of these issues, expressing concern—and rightly so—with not imposing a greater burden on Target than it had already suffered: "I'm not going to make them go through incredible hoops

---

[6] Camp indicated that for salvage goods given away for free, Target would generally seek a tax writeoff. He offered no other testimony on this issue, however.

and itemize every single thing and report to the court as to exactly what they have done with each and every one of them, because I think it would be unfair, and it would be like them getting victimized twice." We in no way begrudge the court's refusal to require Target to assess each recovered item individually in an attempt to determine if they had been yellow-, green-, or red-tagged when stolen, and what the value was at the time of theft. In the court's own words, this would have been "burdensome" and "onerous"— perhaps, as the People claim, a virtual impossibility.

■ Nevertheless, courts are often confronted with restitution situations that require "complicated calculations." (*Giordano, supra,* 42 Cal.4th at p. 661 [calculation of spouse's loss of support]; *People v. Baumann* (1985) 176 Cal.App.3d 67, 74 [222 Cal.Rptr. 32] [lengthy hearing to determine extent of loss attributable to defendant's embezzlement, taking evidence from several witnesses and receiving 75 checks into evidence]; *People v. Baker, supra,* 126 Cal.App.4th at p. 465 [calculating restitution for the theft of cattle, including whether it was appropriate to order restitution for calves that were likely born while the cows were misappropriated].) This complexity of calculation, however, does not absolve the court from awarding restitution in a rational manner that is reasonably related to the victim's loss. And although imprecision does not necessarily amount to an abuse of discretion (*Giordano, supra,* 42 Cal.4th at p. 666 [no abuse of discretion shown despite court's "methodological imprecision"]; *People v. Akins, supra,* 128 Cal.App.4th at p. 1389 [no abuse of discretion because more than one reasonable way to calculate restitution]), it did so here did because it clearly resulted in a merchandise value that was highly inflated over the actual value of the merchandise to Target. While the RGIS inventory was a reasonable starting point, the value should have then been discounted to reflect the true nature of the goods.

The People also dispute that most of the merchandise was damaged, suggesting instead that a large percentage was new. In support, they direct our attention to the probation report, which cites a Target loss prevention officer as stating that 90 percent of the recovered merchandise would have been sold on the sales floor prior to the theft. According to the report, "Yvonne was seen picking merchandise off the shelves on the sales floor 'as if she was shopping' and choosing items out of the warehouse which could have been sold on the sales floor. [Citation.]" The report also cited Beattie as stating that a year prior to the search, Yvonne started bringing "ready to use items and then expanded to unopened boxes of new things." This, according to the People, establishes that Yvonne stole new merchandise from Target. While Yvonne admitted at the restitution hearing that the stolen merchandise included some new items that had been placed in the stockroom by nighttime employees, all testimony at the hearing—that of Yvonne, Beattie, Clarke, and

even Camp, Target's own witness—consistently described the stolen merchandise as largely damaged and unsellable. To claim that most of it was new is simply contrary to the record.

The People also challenge defendants' reliance on *Thygesen, supra*, 69 Cal.App.4th 988, a case we find particularly instructive. Defendant Bendix Thygesen rented a used cement mixer from a small equipment rental company. He failed to timely return the mixer, claiming it had been stolen, and ultimately pleaded guilty to theft of the mixer. The probation report estimated the mixer's replacement value at $1,400 for a new one and $500 to $700 for a used one. At a restitution hearing, the manager of the rental company testified that he did not know the age of the mixer, its original cost, or how often the mixer had been rented prior to its loss. Offering a catalog containing list and discounted prices for mixers that were similar but not identical to the stolen mixer, he then testified that the replacement cost of the mixer was $3,331. He also requested $3,822 for the loss of use of the mixer, testifying that the monthly rental cost was $294 and that the mixer had not been replaced in the 13 months since the theft. Required by the court to choose between receiving $2,098.87 for the mixer's replacement or $3,822 for the loss of use, the manager elected to receive restitution for the loss of use, which the trial court then ordered. (*Id.* at pp. 990–991.)

The Court of Appeal reversed. It observed that because "a victim is to be made whole" and must be reimbursed for every economic loss, "there was no logical reason why the trial court made [the manager] choose between the replacement value of the mixer or the 13 months' loss of rental value." (*Thygesen, supra*, 69 Cal.App.4th at pp. 994–995.) More significantly for our purpose, the court further noted that as to the replacement value of the mixer, the "award should have been predicated on the 'replacement cost of *like* property' " in accordance with section 1202.4, subdivision (f)(3)(A). (69 Cal.App.4th at p. 995.) In the case of the mixer, that meant "what it would cost to replace it with a mixer of like type and age." The court explained: "As to a victim, the purpose of the restitution statute is to make that victim whole, not to give a windfall. [The rental company] is not entitled to replace a used mixer with a brand new one at appellant's expense, absent some extraordinary facts. If [the company] were a car rental agency that lost a 1995 Ford Taurus, it would be entitled to the replacement value of a similar 1995 Ford Taurus, not a 1999 model." (*Ibid.*)

Likewise here. Target was entitled only to restitution equal to the value of the stolen property, and by all accounts at the hearing, the value was substantially less than the last retail price for most goods. By failing to account for the fact that a majority of the stolen merchandise was already damaged at the time of the theft—and thus destined for donation—the trial

court awarded Target restitution for property that was of greater quality than that which defendants stole. This contravened section 1202.4, subdivision (f)(3)(A)'s mandate that the victim is only entitled to compensation for *like* property. As such, it was an abuse of discretion.

The People claim *Thygesen* "does not stand for the proposition that the court cannot use the value of a new item as the basis for restitution for a stolen or damaged item of the same kind." Instead, they attempt to distinguish it on the facts, explaining, "The situation here differs from that in *Thygesen*. Simply stated, Target is not in the business of renting items. Nor is it in the business of selling used or outdated goods, such as the recovered stolen merchandise. Investigator Camp testified that it was Target's policy not to reshelve for sale the recovered goods, presumably to protect the Target name and reputation. Moreover, in *Thygesen*, the stolen property was *one* cement mixer owned by a rental business. The cost of the one used mixer plus the loss of use could be easily proven and calculated. In this case Target basically lost the value of six semi-trailers containing various types of goods that had been stolen, in addition to stolen goods that were never recovered. As discussed above, it would be impossible to determine the condition of each item when it was stolen and when each item was stolen, in order to calculate the value of the item at the time it was stolen."

It is true, as the People argue, that *Thygesen* is based on a different set of facts. This does not, however, negate the point of law for which it stands: as directed by section 1202.4, subdivision (f)(3)(A), restitution is to be based on the replacement cost of a *like* item. (*Thygesen, supra*, 69 Cal.App.4th at p. 995.) Here, that means Target was entitled to the replacement value of mostly damaged merchandise.

The People suggest that instead of *Thygesen*, this case should be governed by *People v. Foster* (1993) 14 Cal.App.4th 939 [18 Cal.Rptr.2d 1], in which the defendant was ordered to pay $8,000 plus a 10 percent fee for a Persian rug he stole during a residential burglary. The amount was based on the victim's statement to the probation officer that she had paid $8,000 for the rug. (*Id.* at pp. 943–944.) On appeal, the defendant challenged, inter alia, the restitution order, arguing that it was improper to base the restitution award on the original cost of the rug. (*Id.* at p. 945.) The court disagreed, concluding that "absent unusual circumstances, or a showing by the defendant to the contrary, the original cost of a stolen item may be treated as evidence of replacement cost for purposes of restitution." (*Id.* at p. 946.) The People seem to read *Foster* as suggesting that in certain circumstances, the court may award restitution equal to the cost of a new replacement. This is not the case, as recognized by *Thygesen, supra*, 69 Cal.App.4th 988. *Foster* merely reaffirms that the proper measure is the replacement cost, and

recognizes that in certain circumstances—circumstances that have no applicability here—the original cost may be evidence of the replacement cost.

2. *The Trial Court Improperly Awarded Target a Windfall by Ordering Restitution Based on the Merchandise's Retail Price Instead of Wholesale Price*

Defendants also argue that the trial court erroneously awarded Target a windfall by calculating the value of the merchandise based on the retail price, or the price at which Target sells the merchandise to its customers, instead of the wholesale cost, or the price at which Target buys the goods and which it would pay to replace them. This, they argue, awarded Target profits on the merchandise when, in fact, they were only entitled to the replacement cost, which is the wholesale price.[7] The People disagree, claiming that "[v]ictim restitution can be based on the retail value of the property stolen." This is so, they reason, because section 1202.4, subdivision (f)(3) entitles Target to "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." And, they specifically note, section 1202.4, subdivision (f)(3)(E) expressly identifies "profits lost by the victim" as a compensable item. The People's argument is flawed for one fundamental reason: the prosecutor presented no evidence that Target lost any profits as a result of the theft.

Most of the stolen merchandise was never going to be sold to customers because it was, quite simply, unsellable. The yellow-tagged items were to be returned to the vendors for credit to Target. Although never expressly stated by Camp, logic dictates that Target would only receive a credit in the amount it paid to acquire the product from the vendor; certainly the vendors do not credit Target for its potential profit. The red-tagged items were damaged goods that could not be donated for any compensation and were given away for free. There is no rational basis for awarding profit on such merchandise. Finally, while some green-tagged items were to be given away at a total loss (again not justifying an award of profit), others were to be "donated" at 30 percent of the last retail price. There was no evidence offered at the restitution hearing that the 30 percent Target would have received for these goods exceeded the wholesale price. In other words, there was no evidence that Target profited when it donated the salvage goods to charities. It was the prosecutor's burden to produce prima facie evidence of this loss. (*Millard, supra,* 175 Cal.App.4th at p. 26; *Giordano, supra,* 42 Cal.4th at p. 664.) This, it failed to do.

---

[7] Yvonne did not make this argument in her opening brief, instead requesting leave to file a supplemental brief to do so. We granted her request.

As to the small percentage of new, sellable items, there was no evidence that there was not a comparable replacement to sell to Target's customers. These were not unique products, but were mass-produced consumer goods that Target sold in abundance. Indeed, the fact that Target is a massive, nationwide retail store with a system for tracking goods suggests the items stayed in stock and no customer was ever deprived of a purchase. (See *People v. Ortiz, supra,* 53 Cal.App.4th at pp. 798–799 [victim of music counterfeiting scheme was not entitled to recover for " 'potential loss' " in sales of music cassette tapes because counterfeit tapes had been recovered and therefore could not be sold by the counterfeiter].)

■ *Thygesen,* this time relied upon by the People, does not change the result. As previously explained, the *Thygesen* court held in part that the trial court erred in requiring the victim to elect between compensation for the stolen cement mixer and the rental income the company lost in the absence of the mixer because the company was entitled to compensation for all losses it suffered as a consequence of the defendant's criminal conduct, which losses could include the stolen equipment *as well as* lost rental income. (*Thygesen, supra,* 69 Cal.App.4th at pp. 994–995.) In a passage quoted by the People, the court explained: "Losses to victims will vary from case to case. For example, in a situation involving a victim who has a ring or necklace stolen, there may be no economic loss other than the actual value of the ring or necklace. The same is not true of a victim who is in business. The economic loss may well include the loss of revenue the stolen item would have produced." (*Id.* at p. 994.) This, the People submit, supports their claim that Target was entitled to the profits the stolen merchandise would have generated. We agree that the victim's economic loss may include lost revenue or profit—where there is evidence of such loss. Here, there was simply no such evidence, despite the People's unsubstantiated claim that "[t]he record shows otherwise." (See *id.* at p. 995 ["absolutely no evidence presented to the trial court from which a rational determination" of lost revenue could have been made].)

The People also take exception to defendants' suggestion that the court could have obtained "an estimate of the average percentage by which Target marks up the items that it sells" and then applied that "average percentage of markup to the total in this case" to arrive at an "approximate calculation of the replacement value of the items in question." According to the People, it would have burdened Target to determine an average markup, and since the markup varies by product, it would not have been a rational method for calculating the replacement value of the stolen merchandise. We do not doubt that to be the case. Nevertheless, we reiterate that complexity of calculating the value of the loss to Target does not permit the court to award Target a windfall, which it did by awarding Target profit on the merchandise despite any indication that it actually suffered a profit loss.

Finally, the People attempt to distinguish *People v. Ortiz, supra,* 53 Cal.App.4th 791, which Michael cites for the proposition that there is no right to restitution for "potential loss." In that case, the court held that a victim of a music counterfeiting scheme was not entitled to recover for a " 'potential loss' " in sales caused by the defendant's counterfeit music cassette tapes because the tapes had been recovered and therefore could not be sold by the counterfeiter. (*Id.* at pp. 798–799.) In a curious argument, the People contend that despite what *Ortiz* expressly holds, a "potential loss" is in fact recoverable, while a "theoretical loss"—which more accurately describes the loss in *Ortiz*—is not. From this, they conclude: "Here, the lost profits were not merely 'theoretical.' They were actual but difficult to calculate; they were 'estimated' or 'extrapolated.' " In fact, there was no evidence—"estimated," "extrapolated," or otherwise—that Target lost any profit due to defendants' theft.

3. *The Trial Court Wrongfully Awarded Target a Windfall When It Ordered Defendants to Pay Target for the Stolen Merchandise and Allowed Target to Retain the Recovered Merchandise*

■ Michael also argues that because the merchandise was recovered, Target was not entitled to restitution for the value of the merchandise, but rather only for the diminution in value between when it was stolen and when it was recovered. This argument is premised on Michael's claim that the recovered items "clearly had significant value," as evidenced by the fact that Beattie held three or four garage sales netting $3,000. This raises the following question: did the trial court abuse its discretion in awarding Target the retail value of the merchandise—a value already inflated above the actual value of the merchandise to Target, as detailed above—*and* allowing Target to retain the recovered goods for disposal at its pleasure? We conclude that it did, as a victim is not entitled to restitution for the value of property that was returned to him or her, except to the extent there is some loss of value to the property. (*People v. Rivera* (1989) 212 Cal.App.3d 1153, 1162 [261 Cal.Rptr. 93].)

That being said, Michael grossly overstates his arguments in support of this claim. First, the garage sales may have evidenced that the merchandise had value to Beattie and defendants, but the value to Target may have been considerably less because it could no longer sell any of the merchandise in the store. Thus, while Michael claims that "[m]eaningful value indisputably inhered in largely undamaged retail property initially worth over $200,000,"[8] the value for which the merchandise could have been disposed would likely have been significantly lower than what Michael believed it to be.

---

[8] A claim, we note, that directly contradicts defendants' fundamental position that the merchandise consistently of mostly damaged goods.

Second, Michael asserts that the court's belief that mitigation would have been onerous "demonstrated a misunderstanding of both the law and the practicalities of the situation." As he explains it, "The court was, quite reasonably, sympathetic to Target's concern about any requirement that it spend days or weeks sorting through the large amount of recovered merchandise. But it would have cost only a few thousand dollars in menial labor to sort through the materials, money that would have been part of the restitution award and which [defendants] would have gladly paid to reduce their ultimate burden. If 10 percent of the merchandise was yellow tag merchandise that could have been returned to the manufacturer for its full value [citation], spending those few thousand dollars would have mitigated the losses by approximately $23,400."

Michael's computation in this regard is specious as there is no basis for his assertion that 10 percent of the merchandise equaled 10 percent of the value of the merchandise. If 10 percent of the merchandise was electronic equipment in working condition, that merchandise would be worth more than 10 percent of the value. On the other hand, if 10 percent of the merchandise consisted of toiletries, the merchandise would likely be worth less than 10 percent of the value.

Mathematical deficiencies aside, nowhere is there any support for Michael's assertion that it would have only cost "a few thousand dollars in menial labor" to sort through the merchandise, a task that would require someone to examine each item of the six trailers full of merchandise to determine what was wrong with it and in what category it belonged. The sheer volume of merchandise suggests that such a task would have been much more burdensome, time consuming, and costly than Michael suggests.

Alternatively, Michael suggests that "Target could have elected the effortless method of having the goods sold by an online auctioneer at eBay or a similar site or through a traditional auction, as suggested by defendant." In the succinct words of the People, "It is inconceivable how [Michael] can describe hiring personnel to list and handle the individual sales, packaging, and mailing of hundreds of items as 'effortless,' let alone cost efficient." We also emphasize that there were six semitrailers full of merchandise. This most definitely would not have been an effortless undertaking.

Despite these shortcomings in Michael's argument, however, we nevertheless agree that it was an abuse of discretion to award Target the value of the merchandise *and* the merchandise. The merchandise was clearly of some value, and returning it all to Target was, in the words of defendants' counsel, "at odds with the court awarding full retail value." As we see it, the court could have allowed Target to retain the goods and ordered defendants to pay

for the diminution in value, or it could have ordered defendants to pay Target for the value of the goods when stolen and then given the merchandise to defendants for disposal to offset the amount they owed Target. Which course the trial court should have chosen is not for us to dictate. But it is for us to say that ordering defendants to pay for the full value of the merchandise *and* giving all of the goods back to Target—to "abandon," for all the court cared—was an abuse of. discretion. The outcome is even more egregious in light of Camp's testimony that Target donated the merchandise but did not even seek a tax writeoff to offset the amount owed by defendants, despite its representation to the court that it would likely do so.

C. *The Trial Court Properly Ordered Defendants to Pay for the Costs of Target's Investigation and of Transporting and Storing the Recovered Merchandise*

Yvonne takes exception with inclusion in the restitution order of RGIS's fees and the costs of transporting the merchandise from Oregon and American Canyon and storing it near a Target distribution center outside of Sacramento. She notes that section 1202.4, subdivision (f)(3)(A) provides for the replacement cost of stolen or damaged property, and subdivision (f)(3)(E) allows for wages or profits lost by the victim due to time spent as a witness or in assisting the police or prosecution. She submits, however, that nothing in section 1202.4 allows for reimbursement of the RGIS fees or the transportation and storage costs. The trial court did not abuse its discretion in reimbursing Target for these expenses.[9]

As a preliminary matter, as to the $15,191 for the inventory services and investigation costs, Yvonne's own counsel *conceded* Target's entitlement to this expenditure: "I fully agree that the cost of the investigation, the $15,000, . . . should be part of the restitution order." Since her counsel consented to the amount, Yvonne waived any objection to it now. (*Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [197 Cal.Rptr. 152] [party waived right to assert an argument on appeal by having expressly consented to the trial court's action].) Waiver aside, the argument fails on its merits.

---

[9] Yvonne specifically challenges the "inventory service's fee," making no mention of the hotel, meal, and car rental expenses that were also included in the $15,191 awarded by the court. We therefore assume she agrees with the propriety of reimbursing Target for the travel expenses related to its investigation of defendants' theft scheme. In the event Yvonne intended to also challenge those expenses, such challenge is misplaced. (See *People v. Ortiz, supra*, 53 Cal.App.4th at p. 797 [court correctly determined that victim's expenses incurred in investigating counterfeiting scheme constituted " 'economic loss incurred as the result of the defendant's criminal conduct' " and was thus compensable]; *People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409 [132 Cal.Rptr.2d 903] [restitution order in criminal case properly included attorney's fees and private investigator fees incurred by the victim of embezzlement in a civil action against employee].)

■ Section 1202.4, subdivision (f)(3) provides that victim restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." It then goes on to provide a list of types of loss that are compensable. (§ 1202.4, subd. (f)(3)(A)–(K).) According to Yvonne, because none of the enumerated categories specifically identify inventory, transportation, and storage expenses, those losses are not compensable. Yvonne overlooks the important fact that the provisions of section 1202.4, subdivision (f)(3) are merely examples of types of loss that are compensable, examples that are provided *without limitation*. What controls is whether the "economic loss [was] incurred as the result of [defendants'] criminal conduct" (§ 1202.4, subd. (f)(3)), and the RGIS fees as well as the costs to transport and store the recovered merchandise unquestionably were. We therefore cannot say that the trial court abused its discretion in including these expenses in the restitution order.

Urging a contrary result, Yvonne relies on *People v. Friscia* (1993) 18 Cal.App.4th 834 [22 Cal.Rptr.2d 656]. *Friscia* addressed whether time expended by the owners of a preschool to prepare an accounting of the loss they suffered due to an employee's embezzlement constituted lost wages or profits within the meaning of the restitution statute. The court held that it did not, because there was no evidence that the owners "suffered the loss of wages or ascertainable profits." (*People v. Friscia, supra,* 18 Cal.App.4th at p. 837.) According to Yvonne, "Target's costs with respect to the inventory and with respect to the transport and storage of the recovered goods fall into the category of accounting" expenses that the *Friscia* court rejected. This is, quite simply, wrong. There is no analogy between the inventory, transportation, and storage costs on the one hand and lost wages or profits on the other.

### D. The Restitution Order Did Not Violate Defendants' Sixth Amendment Right to a Jury Trial

■ In their final argument, defendants claim the court's restitution order violated their Sixth Amendment right to a jury trial. This is so, they reason, because the "restitution order in this case constitutes punishment above and beyond that authorized by the elements of the offense," and any such punishment cannot be "imposed without jury findings of fact . . . ." This argument derives from *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] and its predecessors, including *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], in which the United States Supreme Court recognized a defendant's Sixth Amendment right to a jury trial on any fact that exposes the

defendant to a potentially greater sentence than that supported by facts found by the jury to be true. In *Giordano, supra,* 42 Cal.4th 644, the California Supreme Court recently observed that courts have long held that restitution hearings require fewer due process protections than civil hearings or criminal hearings of guilt, further noting, however, that these cases were decided prior to *Cunningham* and its progeny.[10] Relying on *Giordano,* defendants argue that they were entitled to a jury trial on the amount of restitution they owed Target.

 While the California Supreme Court has yet to weigh in on the question of whether a restitution hearing must be tried to a jury, the Fourth District Court of Appeal most recently answered this question—and not favorably for defendants. In *Millard, supra,* 175 Cal.App.4th 7, 35, the court rejected the defendant's claim that he had a Sixth Amendment right to a jury trial at a section 1202.4 victim restitution hearing, disagreeing with his "premise that Penal Code section 1202.4 victim restitution constitutes increased punishment for a crime." It agreed instead with the court in *People v. Harvest* (2000) 84 Cal.App.4th 641 [101 Cal.Rptr.2d 135] that " 'the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime,' " a collection procedure that is civil in nature. (*Millard, supra,* 175 Cal.App.4th at p. 35.) The *Millard* court explained that "[t]o the extent a victim restitution order has the secondary purposes of rehabilitation of a defendant and/or deterrence of the defendant and others from committing future crimes, those purposes do not constitute increased punishment of the defendant . . . ." (*Id.* at pp. 35–36.)

We rejected a similar argument in *People v. Wilen* (2008) 165 Cal.App.4th 270, 288–289 [80 Cal.Rptr.3d 895]. And, as in *Wilen,* we note that while defendants can cite no California authorities in support of their position, federal cases addressing the issue are to the contrary. (See *U.S. v. Milkiewicz* (1st Cir. 2006) 470 F.3d 390; *U.S. v. Williams* (11th Cir. 2006) 445 F.3d 1302, 1310–1311; *U.S. v. Reifler* (2d Cir. 2006) 446 F.3d 65, 118–120; *U.S. v. Leahy* (3d Cir. 2006) 438 F.3d 328, 337–338; *U.S. v. Miller* (8th Cir. 2005) 419 F.3d 791, 792–793; *U.S. v. Sosebee* (6th Cir. 2005) 419 F.3d 451, 454, 461; *U.S. v. Garza* (5th Cir. 2005) 429 F.3d 165, 170; *U.S. v. Bussell* (9th Cir. 2005) 414 F.3d 1048, 1060; *U.S. v. George* (7th Cir. 2005) 403 F.3d 470, 473; *U.S. v. Wooten* (10th Cir. 2004) 377 F.3d 1134, 1144–1145.) In light of all this, we conclude defendants' argument is without merit.

---

[10] Because the defendant in *Giordano* did not raise any due process or other state or federal constitutional challenges, the court had no occasion to address such possible challenges to restitution hearings. (*Giordano, supra,* 42 Cal.4th at p. 662, fn. 6.)

## DISPOSITION

One purpose of restitution is to make the victim of a crime whole, and Target undoubtedly deserved to be compensated for the significant losses it suffered as a result of defendants' criminal conduct. The trial court faced a complicated task in calculating Target's loss, a calculation that could only be a rough approximation at best. But rather than a rough approximation, the trial court awarded Target a sizable windfall, a windfall the law simply does not allow. Reversal is thus warranted, and the matter is remanded for a further hearing on the amount of restitution owed by defendants to Target in accordance with the above.

Kline, P. J., and Haerle, J., concurred.