Filed 5/24/13  P. v. Bermudez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER BERMUDEZ,<br><br>     Defendant and Appellant. | A135693<br><br>(San Francisco County<br>Super. Ct. Nos. 10022384, 10004772) |

Alexander Bermudez challenges the amount of restitution awarded to a victim who lost his home as a result of Bermudez's criminal conduct.  He contends that the trial court abused its discretion in calculating restitution based on an appraised value of the home at the time of the crime.  We disagree and affirm the restitution order.

I.
BACKGROUND

A. *The Criminal Charges and Disposition*

Bermudez was charged in two separate cases with multiple counts of committing a financial crime against elder or dependent adults (Pen. Code, § 368, subd. (d))[1] and grand theft (§ 487(a)).  He negotiated a plea bargain under which he pleaded guilty to two counts of grand theft, and the remaining charges were dismissed.  The trial court suspended imposition of the sentence and placed Bermudez on probation for five years.  As a condition of probation, the court ordered Bermudez to serve 364 days in jail, which he had already completed at the time of the court's order.

---

[1] All further statutory references are to the Penal Code.

1

The trial court also awarded restitution to Bermudez's victims. Although Bermudez did not dispute the amount of restitution sought for three of his four victims, he challenged the amount sought for his fourth victim, Thomas R. He argued that it was improper for the court to calculate the amount of Thomas R.'s restitution by using an appraised value of the home Thomas R. lost through foreclosure rather than by using the amount of the mortgages Bermudez induced Thomas R. to assume.

B. *Victim Thomas R.*

Thomas R. was 59 or 60 years old when he was victimized by Bermudez. According to an evaluating psychologist, Thomas R. has "borderline intellectual functioning," which means that he has a below-average IQ but functions higher than if he were "mentally retarded."

Thomas R. lived in a house in Daly City given to him by his father. The house was mortgage free. Thomas R. paid for his living expenses by working as a singer and photographer.

Sometime in the spring of 2006, Bermudez met Thomas R. by chance at a barbershop. After overhearing Thomas R. mention a desire for a remodeling loan, Bermudez introduced himself and said he was in the real estate business. Thomas R. told Bermudez he wanted $10,000 to $15,000 to remodel his kitchen. On Bermudez's invitation, Thomas R. later met Bermudez at his office. At the office, Bermudez proposed a loan substantially higher than $10,000 to $15,000. Bermudez further suggested that they go into business together in real estate ventures and a limousine service.

So began a series of loans eventually totaling $550,000 that largely benefited Bermudez but were secured by Thomas R.'s house. The first loan was a bank loan in July 2006 for $200,000 (the first loan). The application in connection with that loan stated that the property was worth $700,000. An appraisal prepared shortly after the loan closed valued the property at $650,000. In November 2006, the bank increased its loan by an additional $150,000 (the second loan). And a few months later, Bermudez arranged a third loan for $200,000 from a private investor (the third loan). According to

2

the mortgage broker for the third loan, the value of the property at the time of this loan was $750,000 even though a contemporaneous appraisal reflected a higher value.

Bermudez, or people associated with him, received at least half of the proceeds from the first two loans directly from the escrow accounts when the loans closed. The remaining funds went into a bank account in Thomas R.'s name. This account, however, was steadily drained in $5,000 to $10,000 increments. According to Thomas R., Bermudez would take Thomas R. to the bank, where he would withdraw money in person and hand it over to Bermudez.

Thomas R. acknowledged that he received and spent some of the money from the loans. After the first loan closed, he used some money to remodel his kitchen and to buy a television. He also withdrew smaller sums (up to $300 at a time) from an ATM for living expenses.

By the time of the third loan, Thomas R. had signed a grant deed making Bermudez a co-owner of the house. When the net proceeds of the third loan ($189,582.97) were disbursed, the entire amount went directly to Bermudez who used the money to pay off other loans, make payments toward various automobiles, and pay other expenses for himself and his family members.

After the three loans were finalized, Bermudez took Thomas R. to an attorney who prepared an agreement at Bermudez's direction. The agreement, dated March 28, 2007, summarized the loans, identified money that supposedly went to Thomas R., and made Bermudez responsible for repaying the loans. The agreement further provided that Thomas R. was transferring a 50 percent joint tenancy interest in the property to Bermudez. Thomas R. signed the agreement.

Bermudez failed to pay off the loans, and the holder of the mortgage on the first and second loans foreclosed on the property. The property was sold in November 2009 for $470,000. The private investor who made the third loan lost his principal.

Before the foreclosure, Bermudez put Thomas R. out on the street. Bermudez went to Thomas R.'s home one day and told him that he had to move out so the property could be rented. Thomas R. gathered some clothes and his toothbrush, and Bermudez

3

took him to a motel for the night. The next day, Thomas R. returned to his home and found the locks had been changed. A woman answered the door, said she was renting the home, and told Thomas R. to leave. For a time, Thomas R. slept on the street a few blocks from Bermudez's office. Ultimately, Thomas R. lost everything he owned, including his dog. He was homeless for over two years.

## C. *The Restitution Order*

At the restitution hearing, Bermudez argued that the starting point for calculating Thomas R.'s restitution should be the total amount of the loans ($550,000). From this starting point, he urged the court to reduce the award first by $185,260 or more because Thomas R. "acknowledged receiving" this amount in the March 2007 agreement. He then urged a further reduction of $95,529, which he claimed reflected the total amount withdrawn from Thomas R.'s bank account in the three months after the first loan. Bermudez also suggested that Thomas R. gave other people access to his bank account, and they may have withdrawn money from it.

The trial court declined to accept Bermudez's calculation and argument. It awarded Thomas R. $650,000 in restitution after the district attorney pointed out that Bermudez's criminal conduct left Thomas R. homeless and that the appraised value of the house in July 2006 was $650,000.

## II.
## DISCUSSION

With these facts and procedural history in mind, we turn to the law governing restitution. Our starting point is the applicable standard of review. A trial court's restitution order is reviewed for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663.) The trial court's discretion in calculating restitution is broad, but the method it employs must be rationally designed to determine the victim's economic loss. (*Id.* at pp. 663-664.) "No abuse of that discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result." (*Id.* at p. 665.)

4

Restitution is mandatory. "[I]in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states them on the record." (§ 1202.4, subd. (f).) While the victim's right to restitution is to be broadly and liberally construed (*People v. Phu* (2009) 179 Cal.App.4th 280, 283), restitution should not result in a windfall (*People v. Busser* (2010) 186 Cal.App.4th 1503, 1510).

In this appeal, Bermudez renews the arguments he made below and reiterates that the proper starting point for calculating Thomas R.'s restitution should be the amount of the loans. He claims that basing the restitution on the 2006 appraised value of the house, without taking into consideration the amount Thomas R. received from the loan proceeds, results in a windfall. We disagree.

The trial court acted well within its discretion in declining to base its calculation of the restitution award on the sum of the loans. This sum would not have reflected Thomas R.'s full loss because the record is clear that Thomas R.'s house, which was eventually lost in foreclosure as a result of Bermudez's fraud, was worth substantially more than the loans. The application for the first loan stated that the house was worth $700,000, and the mortgage broker at the time of the third loan estimated the value of the house to be $750,000. This mortgage broker testified that he would not have arranged a loan for anywhere near the total value of the property, and he believed that it was "safe" to lend another $200,000. The total encumbrances with the third loan ($550,000) would amount to less than 75 percent of the property's estimated value. This evidence makes it clear that at the time of the loans Thomas R.'s home was worth substantially more than their sum.

Bermudez suggests that the trial court's reliance on just one appraisal report was speculative. We disagree. Even if we were to conclude that a single appraisal in a case like this is an insufficient basis to support a restitution order—a conclusion we need not

5

and do not reach—there is ample evidence in the record supporting the reasonableness of the trial court's measurement of Thomas R.'s loss. As mentioned above, the evidence shows that the value of the house ranged from a low of $650,000 to over $750,000. It was to Bermudez's benefit that the trial court selected the *lowest* of these valuations in calculating Thomas R.'s restitution, and Bermudez is in no position to dispute these valuations now after having readily accepted them when profiting from his crime.

Bermudez also argues that the trial court should not have calculated restitution by using the home's value at the time Thomas R. was defrauded and points out that the property was eventually sold for $470,000. But this sale took place years later, after a foreclosure, and its distressed price was by no means an accurate measure of Thomas R.'s full loss. (See *People v. Giordano, supra,* 42 Cal.4th at p. 658 [object of restitution is to restore economic status quo]; see also *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1181-1182 [trial court could have ordered defendants to pay victim for value of goods when stolen].)

We are not persuaded by Bermudez's contention that the trial court was required to offset the restitution award by the relatively small amount of the loan proceeds that Thomas R. received. Once a victim makes a prima facie showing of economic loss, the burden shifts to the defendant to disprove the amount of loss claimed by the victim. (*People v. Taylor* (2011) 197 Cal.App.4th 757, 761; see also *People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1137 [defendant seeking offset or credit to restitution order had burden of proof as to each fact essential to claim for relief].) Here, Bermudez has failed to meet this burden.

Thomas R. never denied that he received and spent some of the loan money. But Bermudez's characterization of that amount as "a significant portion of the loan money" finds no support in either the preliminary hearing transcript or any evidence introduced at the restitution hearing. The larger amounts cited by Bermudez—up to $25,000 for kitchen remodeling expenses and $2,000 for a TV—went for improvements to the house and personal property that Thomas R. lost when he was removed from his home, and it was foreclosed upon. The smaller amounts—periodic ATM withdrawals of up to $300—

did not add up to a substantial sum in relation to the overall loss. Bermudez suggests that some of these withdrawals may have benefitted people associated with Thomas R. But these suggestions were never adequately proven and, were it not for Bermudez's criminal conduct, these people would never have been able to access the account because it would not have existed.

Bermudez argues that the larger ($5,000 to $10,000) withdrawals that Thomas R. withdrew in person at the bank benefitted Thomas R. In support of his claim, he cites the March 2007 agreement in which Thomas R. acknowledged receiving $182,260 from the loan proceeds. This amount was apparently intended to reflect the funds deposited into Thomas R.'s bank account when the first two loans closed. But the evidence shows that much of this did not end up in Thomas R.'s pocket. The clear import of the preliminary examination testimony was that while some loan proceeds went into Thomas R.'s bank account, most withdrawals from that account were for the benefit of Bermudez. In light of this testimony, it became Bermudez's burden—one that he failed to satisfy—to show with some degree of specificity how much of the money truly went to Thomas R. We conclude that the trial court acted well within its discretion in disregarding the self-serving agreement Bermudez had prepared after the loans were made.

The law does not require that "the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.) Here, Bermudez criminally induced Thomas R. to mortgage his home, used most of the loan proceeds for his personal benefit, and caused the property to be lost to Thomas R. through a foreclosure. Under these circumstances, the trial court acted well within its discretion in awarding restitution based on the appraised value of property at the time of the crime.

III.
DISPOSITION

The restitution order is affirmed.

7

_____

Humes, J.

We concur:

_____

Ruvolo, P. J.

_____

Rivera, J.