Filed 4/21/15  P. v. McCulley CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075333 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F03538) |
| v. | |
| LESLIE MARIE McCULLEY, | |
| Defendant and Appellant. | |

A jury found defendant Leslie Marie McCulley guilty of attempted premeditated murder of a police officer engaged in the performance of his duties (during which a principal was armed with a gun), reckless evasion of police pursuit while personally using a gun, being a felon in possession of a gun, and concealing or withholding a stolen car.  The trial court subsequently sustained a recidivist allegation for a 2008 drug offense. It sentenced her to an indeterminate state prison term of 15 years to life, consecutive to a determinate term in excess of 16 years.  At a hearing after judgment, the court awarded

1

restitution (as is pertinent) to the City of Sacramento (the City) of $55,000 (rounded). Defendant appeals from the judgment and the order after judgment.

To reorder her contentions in line with our analytic approach, defendant argues the trial court erred in instructing on the necessary intent for vicarious liability and in failing to include a unanimity instruction in connection with the allegation of personal use of a gun, and also abused its discretion in admitting evidence about her 2010 criminal conduct. She further contends the prosecutor committed misconduct in arguing in favor of a legally inadequate theory as a basis of attempted murder. Finally, she claims the trial court erred in awarding restitution to the City for "repair" *and* replacement of a canine officer's dog on whom her deceased partner in crime inflicted near fatal injuries. (Defendant also notes a clerical error in the abstract of judgment that the People concede.) We reject her claims and shall affirm the judgment and restitution order, with directions to the trial court to issue an amended abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant does not dispute the sufficiency of the evidence to support the verdicts, and our resolution of her arguments does not require us to assess prejudice (except for her claim regarding the need for a unanimity instruction).[1] As a result, we do not need to delve deeply into all of the nuances of the trial record in our factual summary.

### The Pursuit and Shooting

In accordance with his usual practice of randomly checking the status of license plates while on patrol, an officer driving on Broadway in Sacramento on the morning of May 18, 2012, discovered that a Camry with four occupants was listed as stolen from Chico. He followed the Camry, requesting assistance. The Camry drove south through the Land Park neighborhood before doubling back northbound on Freeport Boulevard.

---

[1] As a result, her claim of cumulative prejudice necessarily fails.

2

By now, there was a procession of five or six police vehicles following it. The Camry turned into the parking lot at Sacramento City College and then suddenly accelerated, driving over the lawn and back onto the street. The police eventually called off the chase because it reached excessive speeds through the residential Hollywood Park neighborhood before the Camry turned into a schoolyard where children were taking recess outside. The Camry sped across the football field and through the perimeter fence to the street on the other side. A witness in the schoolyard could see that a man was driving the car.

Shortly afterward, a driver saw a car (which he called a Corolla) come screeching to a near stop on Meer Way just off Freeport. Two men jumped out. One ran off; the other stood around "trying to look rather nonchalant."

Officers reinitiated pursuit as the Camry sped north on Freeport. As they approached McClatchy High School, dispatch again cancelled the chase for reasons of public safety. Heading west on Second Avenue (the first through street), officers found the Camry abandoned near Marty Way and Fourth Avenue, pointed to that location along the way by pedestrians who had observed the route of the car. About three blocks away, another officer canvassing the neighborhood observed a man and a woman who were walking rapidly on Swanston Drive toward Riverside Boulevard. They caught his attention because they seemed out of place for the neighborhood (the man wearing a leather trench coat without a shirt). The woman was defendant.

The officer parked his car near them and got out. He asked them to approach him. The man immediately became upset and protested that he was not on parole. As he was backing up, he was feeling for something in his pants with one hand, and then stuck his other hand in his pocket. The officer, concerned about his safety, drew his gun and told the man to raise his hands. The man turned and headed quickly down Riverside. The officer followed after him as the man turned onto Robertson Way, with defendant trailing

3

the officer. The officer thought it odd that the man was not really making a concerted effort to escape.

A canine officer arrived and took over the chase, sending his canine partner (Bodie) after the man, who had fled into a backyard. Officers were in the process of taking defendant into custody when they heard shots fired.

The canine officer had followed Bodie into the backyard. He saw Bodie run into the overgrown shrubbery after the man, who turned and fired a gun at the dog. The officer heard Bodie yelp, at which point the man turned to face the officer through the bushes. The officer heard a shot fired in his direction. The officer returned a volley of shots. The man fell, and the officer turned his attention to Bodie, who was bleeding profusely from the mouth. The officer drove Bodie to an emergency veterinary hospital in Rancho Cordova. The bullet had shattered Bodie's left jaw, severed his tongue, and fractured two bones in his paw. After two surgeries and extensive care, Bodie recovered from his injuries but was unable to resume his function as a canine partner.

Following the shots, the man's legs were visible on the ground under the bushes, but he was unresponsive to commands. After about 20 minutes, officers approached cautiously, not knowing if the man was still armed and lying in wait. Another canine partner, Rollo, was dispatched to drag him out of the bushes. Officers then determined the man was dead. He had a gun holster around his torso. There were eight bullet wounds, several of which were the obvious cause of rapid death. Blood tests showed that he had a high level of methamphetamine in his blood.

After struggling with police near the shooting, defendant was apprehended, handcuffed, and placed in a police vehicle. When questioned at the scene, she identified the man she was with as Lucas Webb, her boyfriend. She claimed to have been the driver of the Camry, in which they were the only two occupants. She asserted that her boyfriend did not have a gun in his possession. Shortly afterward, she admitted there had

been two other passengers in the car, whom she had told to get out of the car. She later identified photographs of the two other passengers. Defendant's hands tested positive for gunshot residue.

That afternoon, the police conducted a lengthy formal interview of defendant. They initially withheld the information that Webb was dead. She told them the decedent had previously killed a police officer; he had an outstanding warrant and never complied with police efforts to initiate a contact (an attitude that she shared).[2] Ordinarily he never let her drive, but she initially claimed that she had been driving the car (bragging about her repeated success in shaking police pursuits in Chico) until after they drove through the schoolyard. Ultimately, she admitted that Webb had been driving during the entire chase, which she had concealed to keep him from going to prison. Police then told her that Webb had died.

### Circumstances of Defendant's Personal Gun Use and Abetting the Shooting

During her interview, defendant first claimed that she had brought the gun with them on the trip. However, after learning he had died, she said it was Webb's, which he carried in a holster. When the police commented on the stippling on her hand, she admitted that she had accidentally fired it during the course of the chase; she had taken it from Webb when he was grabbing for it to prevent him from using it. She then turned around to direct their protesting passengers to quiet down, and was "[wa]ving it around feloniously," though not aiming it at anyone in particular. When they had temporarily shaken off the pursuit, she told the passengers to take off their seatbelts and get out of the car when they stopped momentarily. In the process of abandoning the car, she

---

[2] Decedent Webb's ex-wife confirmed defendant's characterization of him. After he had served a prison term, he was adamant that he would do anything to avoid going back to prison, including killing a police officer if necessary. He frequently voiced an intense hatred of police, and would always evade police contacts.

accidentally shot out the rear passenger-side window. Webb had taken the gun from her at this point and stuck it back in his holster.

Defendant made several calls from jail that night. In the first, she mentioned that she had stayed with Webb when they released their passengers in order to help him. She had taken the gun away from Webb to keep him from using it, and fired it accidentally while abandoning the car (at which point he reclaimed it). During the second call, she repeated this account; she also noted that when they saw the police car after abandoning the Camry, she had told him, "You['re] always talkin' about, . . . you got to get that motherfucker out Luc[a]s or throw it to me and I will." In the third call, she again mentioned taking the gun from him to keep him from using it, until he reclaimed it after she accidentally shot out the window. She also elaborated on the statement in her second call: "[I] told him 'cause he's always sayin,' 'he's g[o]nna shoot him in the face,' right. When . . . the cops walked up on us . . . I looked at him and said, 'Are you goin' to pull the motherfucker? If you don't want to pull the motherfucker, you better throw it back to me 'cause I'll handle that shit.' And that's the last thing I said to him just before he got shot dead." She added, "I coulda told him, 'Daddy, let's just fuckin' [be] in jail, it's just jail, let's fucking just . . . lay down, let's give it up.' He woulda done it," and "[h]e'd still be [alive]." A couple of days later, she called one of her friends back. In describing their last contact before Webb ran off, defendant said she should have told him to surrender; instead, "he looked at me and he dropped his cell phone. And I told him, 'Go. You know what to do. If you don't do it throw it back to me and I'll get rid of 'em.' And he turned and . . . [t]hat's the last thing I said to him." The officer who had pursued them on foot and the canine officer did not recall hearing any conversation between Webb and defendant, though this did not preclude any conversation having taken place.

The police interviewed one of the Camry passengers. He was a close friend of Webb. When on methamphetamine, Webb became out of control and bullheaded. The

6

passenger also knew that Webb would do anything to avoid going to jail, and did not have any respect for the police. The passenger told his interviewers that just before entering the schoolyard, defendant took off her seatbelt and turned around, pointing the gun at him and telling him to quiet down. She looked as if she were pointing the gun toward the rear window in the direction of their pursuers, telling the two passengers to duck down. However, she never fired the gun before he bailed out of the car. He thought she was encouraging Webb not to stop for anything. In a second interview, he made the same assertions, noting that he was not worried about her actually shooting him but of the possibility of a shootout. She may even have stuck the gun out the side window. He also thought she might have said something about shooting at the police. He expressed his concern to the police about being labeled a snitch.

At trial, however, the passenger testified he did not notice any gun until after they drove through the schoolyard, when he saw it in Webb's lap. Defendant took it at some point. After the schoolyard, she turned around in her seat, but did not point the gun at him, or toward the rear window, or stick it out of the window, since police were not behind them any longer. She never announced an intention to shoot at the police. He asserted it was Webb, and not defendant, who said they were not going to stop during the pursuit.

The passenger conceded that he had testified the opposite at the preliminary hearing—that it was defendant who said they were not going to be taken or stopped. He also conceded testifying that she pointed the gun at him, but that was inaccurate. He simply meant the gun was in her hand when she turned to face him. He acknowledged telling his interviewers and testifying that defendant stated she intended to shoot at the police, but that was an unintentional inaccuracy.

7

## DISCUSSION

### 1.0  The Court Correctly Instructed the Jury

#### 1.1  The Instruction Defining Intent for Vicarious Liability Was Correct

The benchmark for the mental state necessary for vicarious liability as an aider and/or abettor of a crime comes from the venerable *People v. Beeman* (1984) 35 Cal.3d 547, 560:  "[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent . . . either of . . . encouraging or facilitating commission of[] the offense."  As *People v. Croy* (1985) 41 Cal.3d 1 subsequently took pains to restate, vicarious liability rests on "the intent to encourage and bring about conduct that is criminal, *not* the specific intent that is an element of the target offense."  (*Id.* at p. 12, fn. 5, italics added; accord, *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122 (*Mendoza*) [mental state necessary for vicarious liability "is *different from* the mental state necessary for conviction as the actual perpetrator" (italics added)].)  The pattern jury instruction on this point (CALCRIM No. 401) is a correct statement of the holding of *Beeman*.  (*People v. Perez* (2005) 35 Cal.4th 1219, 1234; *People v. Tillotson* (2007) 157 Cal.App.4th 517, 532 [both finding prior pattern instruction correctly states the law]; see *People v. Houston* (2012) 54 Cal.4th 1186, 1224 [an accomplice "shares the perpetrator's *specific intent*" (italics added) for the target offense *when offering aid or encouragement with knowledge of purpose*; citing prior and present pattern instructions as equivalents with approval as reflecting *Beeman* criteria].)

In the present case, the trial court acceded to defendant's proposal to modify one paragraph in the pattern instruction as follows:  "If . . . defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact . . . .  However, the fact that a person is present at the scene of a crime, *has knowledge that a crime is being committed*, or fails to prevent the crime does not, by itself, make her [vicariously liable]."

8

(Italics added.) It rejected, however, another proposed addition to the pattern instruction: "You may not find [defendant vicariously] guilty . . . unless she: [¶] 1. Actually knew and shared *the full extent* of [Webb's] *criminal intent*; [¶] 2. Actually promoted, encouraged, or assisted [Webb]; [and] [¶] 3. Did so with the intent and purpose of advancing [Webb's] successful commission of the crime. [¶] *It is not sufficient* if [a] person simply gives assistance with knowledge of [a] perpetrator's *purpose.* Merely giving assistance without sharing the perpetrator's purpose *and intent* establishes liability only as an accessory, not as an accomplice." (Italics added.) The trial court concluded this was cumulative of the pattern instruction, argumentative, and confusing in its injection of the irrelevant issue of accessory liability. The court disagreed with counsel that an accomplice must share an intent to kill as opposed merely to offering knowing aid or encouragement of another's intent to kill.

At great length, defendant asserts that the Supreme Court has modified the criteria of *Beeman*—apparently sub silencio—to require that vicarious liability arises only where an accomplice actually shares the specific intent of the perpetrator for the target offense, i.e., specific intent to kill, rather than simply *knowing of* this specific intent. As her defense was a lack of any personal intent to kill (or to have Webb kill), she argues the refusal of her proposed modification was reversible error.

Contrary to defendant's characterization, there has not been any "confusion" in the intervening 30 years about the straightforward *Beeman* criteria (except in the briefs of defendants seeking to establish instructional error) that either *People v. Lee* (2003) 31 Cal.4th 613 or *Mendoza* addressed and resolved in favor of defendant's present argument. All *Mendoza* held was that the *different* specific intent necessary for vicarious liability, knowing assistance or encouragement, was indeed a species of the specific intent subject to defeasance by reason of voluntary intoxication. (*Mendoza*, *supra*, 18 Cal.4th at p. 1129.) It did *not* hold that an accomplice must share the specific intent

9

for the target offense. That the People's brief in *Mendoza* may have misconstrued this principle (as defendant asserts) is not of any moment to the criteria from *Beeman* as incorporated in the pattern instruction.[3] As for *Lee*, defendant's selective quotation elides *Lee*'s reaffirmation of the point made in both *Croy* and *Houston*; while *Lee* indeed states that "the person guilty of attempted murder as an aider and abettor must intend to kill" (*People v. Lee*, *supra*, 31 Cal.4th at p. 624), this was prefaced with the explanation that an accomplice satisfies the element of the specific intent of the crime at issue (premeditated attempted murder) when offering assistance or encouragement with knowledge of the direct perpetrator's purpose, and therefore those who encourage or assist in a premeditated attempted murder are sufficiently blameworthy to be subject to the same punishment even without premeditating the crime on their own part (*Lee*, at p. 624). Thus, the *different* specific intent for the vicarious liability of an accomplice to which *Houston*, *Mendoza*, *Lee*, and *Croy* have all adverted is not and never will be the specific intent that is an element of the target crime. To the extent defendant's special instruction communicated this alternate standard and was not objectionable on any other grounds, the trial court properly rejected it as an incorrect statement of the law.

## 1.2  Lack of a Unanimity Instruction for the Finding on Personal Use

Defendant contends the evidence of her behavior during the police pursuit of the car includes multiple alternative instances on which the jury could base the enhancement for personal use of a gun. She contends the trial court was thus obligated (in the absence of an express election on the part of the prosecutor) to instruct on the need for the jury to agree unanimously on the factual basis for the enhancement.

---

[3] The jury's confusion when "correctly instructed" on the *Beeman* criteria in *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1227-1228, is equally immaterial to defendant's argument because the case does not remotely suggest that there is any problem with the manner in which the pattern instruction states the criteria.

10

Where there are alternative factual bases for an offense, the prosecution must affirmatively communicate to the jury an election of the act on which it bases the count with a "clarity and directness" sufficiently akin to an instruction; otherwise, the trial court must instruct the jury on the need to agree unanimously on the factual basis. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536, 1539.)

In his opening remarks, the prosecutor referred to defendant shooting out the rear passenger window with the gun during the pursuit. In closing arguments, the prosecutor first pointed out that defendant admitted waving the gun around "feloniously" in the car. He then referred to the passenger's police interview (describing defendant as pointing the gun at him and toward the rear window while issuing orders) as evidence that defendant was working as a team with Webb. The prosecutor also argued defendant's claim of accidentally firing the gun only after abandoning the car did not account for all the empty casings in the gun, a neighbor's failure to hear a gunshot at that location, and the absence of any broken glass outside the car, which in his view meant that she must have fired it through the window before that point, although "[s]he's not charged with the discharge in the car" (an adumbrative remark probably referencing the absence of a substantive offense based on the fact). The only express reference to the enhancement came in his final remarks, where he again argued that she must have shot out the window at some earlier point, and "That's a personal use of a firearm during the evasion. She used it during the evasion." He also contended that not only was this action relevant to the "personal arming issue with the assistance of the high-speed chase," this established an attitude relevant to the charge of attempted murder.

The court instructed the jury it could base the enhancement on either displaying the gun in a menacing manner, or on firing the gun. It did not instruct that the jury must unanimously agree on the act underlying the enhancement. During the jury's

11

deliberations, at least two jurors were concerned with the definition of "menacing" (the trial court responding that it should be given its ordinary meaning).

In *People v. Norman* (2007) 157 Cal.App.4th 460, this court observed that the absence of a unanimity instruction "is the most common kind of instructional error in criminal cases." Consequently, this court advised that trial courts should automatically include one unless there is some good reason *not* to give it in the particular case. (*Id*. at p. 467.)

The prosecutor's passing comments connecting the circumstantially established firing of the weapon during the pursuit with the enhancement hardly seem sufficiently akin to an instruction to that effect. However, even if this fails to pass muster as a direct and clear express election, we agree that the error to instruct on unanimity is harmless beyond a reasonable doubt.

The People urge us to apply the principle under which the failure to instruct on unanimity is harmless where the acts are so closely related in time and place that a jury could not reasonably have distinguished among them and therefore must have believed or rejected the evidence in toto, or there was only a single defense offered; we agree with defendant that this principle does not apply here where different witnesses testified about different acts. (*People v. Melendez* (1990) 224 Cal.App.3d 1420, 1430-1431.) The jury had at least three different conflicts to resolve: whether to credit defendant's explanation for the broken window or the prosecution's circumstantial alternative; whether to believe the passenger's original account or his testimony at trial; and which of the actions the passenger attributed to defendant to accept—pointing the gun at him, pointing the gun at the rear window, or pointing the gun outside the car.

However, *by her own admission*, defendant at least waved the gun around in the car in front of the others "feloniously" while ordering the passengers to quiet down. Thus, even if she did not point it at anyone or fire it through the window during the

12

pursuit, this would be sufficient to sustain the enhancement for an implied menacing display.  (See *People v. Jacobs* (1987) 193 Cal.App.3d 375, 381.)  We cannot find any reasonable basis for properly instructed jurors to reject this incriminating admission (despite the passenger's disingenuous testimony at trial that defendant merely kept the gun in her lap), as it is not self-impeaching, inherently improbable, the result of evident bias, or has any other logical basis for doubt.  (*South Bay Transportation Co. v. Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 657; *Camp v. Ortega* (1962) 209 Cal.App.2d 275, 281 [trier of fact cannot reasonably reject the uncontradicted testimony of a witness].)  As a result, we conclude that any jury would inevitably sustain the enhancement if instructed to agree on its factual basis, and retrial would be an idle act.

## 2.0  Evidence of a Previous Criminal Act Was Properly Admissible

### 2.1  Background

Before trial, the prosecutor moved to admit evidence of a May 2010 incident that resulted in defendant's arrest.  According to the offer of proof, an officer was pursuing a car; it crashed, and the officer saw the driver flee into a nearby residence.  Occupants of the residence were not cooperative with police inquiries about the location of the driver or a demand to vacate the residence; the officer (along with support personnel) entered, continuing to identify themselves as they swept through the residence.  The driver, whom officers found inside a closet, surrendered without any incident.  On opening a second closet, the officers found defendant seated inside facing the door with a loaded (though half-cocked) revolver in hand.  One of the officers immediately grabbed the gun away from her.  In the opinion of the reporting officer, defendant would have fired the gun if

13

not disarmed because she had an outstanding arrest warrant.  Defendant told them she had taken the gun away from the fleeing driver to prevent him from firing it.[4]

However, in a postarrest interview in early May 2012 (the result of a traffic detention in Chico for failing to come to a complete stop, during which police found a simulated-revolver pellet gun, a large-caliber bullet, and controlled substances on her person), defendant spontaneously stated that she had intended to shoot at an officer at the time of the 2010 incident, but realized that with a single-action revolver she would wind up dead as a result.  (The offer of proof indicated she made this statement in a boastful and amused manner.)  Concerned about her "kids and things," she had surrendered the weapon to the officer.

The prosecution's motion argued that both cases reflected defendant's *claim* after arrest that she had taken possession of a weapon to disarm another, but reflected *conduct* indicating an intent to turn the weapon on police.  Moreover, her 2012 interview occurred just before the present offense and demonstrated her attitude toward the prospect of shooting an officer.  The prosecutor argued the evidence was consequently relevant to motive and intent.

At the hearing on the motion, defendant argued this evidence related to thoughts, not actions.  She also asserted the speculations of officers involved in the 2010 incident were irrelevant.  The trial court concluded the evidence was relevant to the material issue of intent, demonstrating similar behavior involving the use of guns in the presence of police officers (though it would not permit evidence of the speculations of the officers regarding defendant's intent).  The court found the prior conduct was not unduly

---

[4]  Although charged with assaulting an officer with a gun or exhibiting it to him (as well as obstruction), she ultimately pleaded only to being an accessory in July 2010, receiving a one-year jail term.

14

inflammatory compared to the present offenses, and that prejudice to defendant would not otherwise result.

The officers involved in the 2010 incident and the 2012 interview testified at trial consistent with the offer of proof. (The parties are in agreement on the substance of the testimony, so we do not need to elaborate on further details.) In addition, in an excerpt from a postarrest interview in the present matter (to which the jury listened), defendant asserted that she had taken the gun from the fleeing driver inside the residence in 2010 and aimed it at the police when they found her in the closet before she surrendered it to them. The trial court gave an appropriate limiting instruction that advised the jury it could—but was not required to—consider the evidence in deciding whether defendant acted with the intent to aid and abet Webb in the attempted murder of the officer, taking into account the extent to which the prior incident was similar to the present crime; the instruction prohibited the jury from considering bad character, predisposition, or any other purpose.

## 2.2 Analysis

Premised on her mistaken premise (which we have rejected) that the intent at issue in her trial is the specific intent to kill a police officer, defendant contends this evidence was not relevant to a material issue. (She also renews her claim that she is being tried on the basis of irrelevant thoughts rather than relevant actions.) In conclusory fashion, she then argues this absence of probative value pales in the face of the inflammatory and prejudicial nature of the evidence of her 2010 conduct.

Evidence of uncharged misconduct is admissible pursuant to Evidence Code section 1101 if it is sufficiently similar to the crime at issue such that it gives rise to a rational inference of intent and does not give rise to a substantially greater risk of prejudice or confusion of the issues at trial. (*People v. Foster* (2010) 50 Cal.4th 1301,

15

1328.)  As with any evidentiary ruling, we review the trial court's decision for an abuse of discretion.  (*Ibid*.)

The central issue at trial was the exact nature of defendant's intent in offering encouragement to Webb (as disclosed in her phone conversations).  The 2010 situation rationally informs the resolution of this inquiry, in that defendant chose to lie in wait *with a gun at the ready* knowing that the police were searching the residence.  While it is true a different set of circumstances precipitated this response, this does not affect the pertinent inferences of intent to be drawn from the nature of that response.  If the intent with which she did this could even be considered equivocal, there is the evidence of her own statements (contemporaneous with the present offense) regarding her desire actually to use a gun on the police, and she apparently took pride in expressing her willingness to do so.  Her only qualm was fear for her own safety, something not implicated in giving encouragement to another to do the actual shooting of an officer.  These are hardly mere thoughts that are divorced from deeds; these thoughts accompanied conduct stopping just short of actually firing the gun at a police officer.  Moreover, the evident fabricated nature of her excuse in the 2010 incident—seizing a gun to prevent its use—rationally informed the resolution of whether the identical claim in the present case was genuine.  Thus, the evidence has substantial probative value in determining whether she intended to encourage another whom she knew intended to shoot at a police officer.

In *People v. Harris* (1998) 60 Cal.App.4th 727, 738-739, we assessed factors pertinent to a determination of prejudice under Evidence Code section 1101 in the context of a different provision of that code governing admission of uncharged sex offenses; these include the inflammatory nature of the facts of the prior offense in comparison with the present offense, the possibility of jury confusion (such as where the uncharged acts went unpunished, leading to the temptation merely to punish a defendant for the present offenses), remoteness, and the need for an undue amount of court time in

16

which to establish the prior facts. None of these factors establishes any form of prejudice in the present matter: The prior facts are far less inflammatory than actually shooting at a canine officer and maiming his canine partner, they are not remote, they did not require a significant amount of court time to establish, and the issue of her punishment (or more to the point, any indication she went unpunished) for the prior offense did not arise. As a result, we cannot find an abuse of discretion on the trial court's part in admitting this evidence.

## 3.0  The Claim of Misconduct Is Forfeited

At the very end of his concluding argument, the prosecutor discussed defendant's cavalier attitude in talking with the Chico police about shooting at a police officer in 2010: "[S]he's laughing. She thinks it's funny." In the opinion of the prosecutor, "This is something she wants to do, but she didn't want to get shot back. That's not anything different than attempt[ed] murder."

Defendant seizes on this isolated remark to claim this establishes prosecutorial misconduct resulting in reversible prejudice. She contends this allowed the jury to find her guilty of attempted murder on the basis of an intent to shoot, unaccompanied by any act of assistance or encouragement from Webb. Recognizing that trial counsel failed to object and request an admonition to the prosecutor's remark, she contends the forfeiture was the result of ineffective assistance of trial counsel that was reversibly prejudicial. Alternately, she contends the trial court had a duty sua sponte to address this misconduct. Finally, she asks that we exercise our discretion to reach a forfeited issue.

Failure to lodge a contemporaneous objection *and* a request for an admonition forfeits any claim of prosecutorial misconduct unless a defendant affirmatively establishes that it was irremediable with more than a "ritual incantation" to this effect. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Defendant cannot hope to establish that the remark at issue constituted irremediable misconduct.

Defendant's attempt to reach the issue under the guise of ineffective assistance of trial counsel fails in two regards. In the first place, direct appeal is almost inevitably the inappropriate forum for establishing that the inherently tactical choice of failing to raise an objection to misconduct in closing argument fell below reasonable professional standards. (*People v. Lopez* (2008) 42 Cal.4th 960, 966, 972.) In the second place, defendant does not provide anything more than a perfunctory analysis of *how* the failure to object did not meet objective professional standards *or* resulted in the necessary prejudice, without any consideration of the remainder of closing argument or the instructions. "This will not suffice." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466-467 [rejecting claim of ineffective assistance on this basis].)

In casting the issue as a failure on the part of the trial court to satisfy a *duty* to address misconduct sua sponte, defendant stands precedent on its head. *People v. Ponce* (1996) 44 Cal.App.4th 1380, while speaking in terms of "duty," was in fact a situation in which the trial court *took action* to address factually unsupported argument on the part of defense counsel under its *discretionary* powers to ensure the orderly administration of justice. (*Id*. at pp. 1387-1388.) Nothing in the case imposes a duty on a trial court to address purported misconduct in argument sua sponte.

Finally, although we have discretion to consider an issue regardless of forfeiture, this applies only where it raises a question of law on such undisputed facts as appear in the record on appeal. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 415, pp. 473-474.) This is a disfavored course of action; it is unjust to the opposing party, unfair to the trial court, and contrary to judicial economy (i.e., a waste of the time of the parties and the judicial branch) since it encourages the embedding of reversible error through silence in the trial court. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873.) As a result, we ordinarily exercise our discretion to excuse forfeiture "rarely and only in cases presenting

an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  The circumstances of the present case hardly satisfy this stringent criterion.  As a result, the claim of prosecutorial misconduct is not cognizable in this appeal.

## 4.0  The Court Properly Awarded Restitution

Defendant did not dispute the factual basis for the amount of restitution the City was seeking,[5] only the legal propriety of ordering restitution.  As her main point, defendant argued that the direct victim of her crime was the canine officer, not his injured canine partner belonging to the City.  Following the postjudgment hearing, the trial court made several findings in support of its restitution order, reimbursing the City for the costs of treating Bodie and replacing him with a new canine partner.  The shooting of Bodie was factually intertwined with the attempted murder of the canine officer (as noted above, Webb shooting at Bodie when cornered in the backyard immediately before shooting at the canine officer).  Defendant was found guilty of the attempted murder, her abetting being a substantial factor in the commission of the crime.  The injuries to Bodie were a proximate result of the crime.  Because Bodie was the property of the City, the City was consequently a direct victim of defendant's crime within the meaning of Penal Code section 1202.4[6] and entitled to an award of restitution.

### 4.1  The City Was a Direct Victim

Where a victim suffers economic losses as a function of a defendant's actions that resulted in her convictions, a trial court must require the defendant to make restitution as part of the sentence.  (*People v. Phu* (2009) 179 Cal.App.4th 280, 283; *People v. Lai* (2006) 138 Cal.App.4th 1227, 1249.)  We give the right to victim restitution a broad and

---

[5]  Although a voluntary association defrayed the bulk of these costs, this is irrelevant to an award of restitution.  (*People v. Hove* (1999) 76 Cal.App.4th 1266, 1272-1273.)

[6]  Undesignated statutory references will be to the Penal Code.

liberal construction. (*Phu*, at p. 283.) We review the court's restitution order for an abuse of discretion. (*Id*. at pp. 283-284.) An order based on an error of law would be an abuse of discretion. (*People v. Jennings* (2005) 128 Cal.App.4th 42, 49.)

An entity is entitled to restitution only where it is the "direct" victim of a crime. (§ 1202.4, subd. (k)(2).) A direct victim is either the immediate "object" of the offense or the entity "against which" a defendant committed the crimes; the connection must be proximate and immediate, rather than through any intervening actor or entity. (*People v. Slattery* (2008) 167 Cal.App.4th 1091, 1095-1096.) This is in contrast with a third party entity that incurs costs not because a defendant took any action against it but because it had a duty to reimburse the party against whom the defendant actually took action (i.e., an insurer (*People v. Busser* (2010) 186 Cal.App.4th 1503, 1509)), or its costs are a part of its ordinary governmental functions (*People v. Martinez* (2005) 36 Cal.4th 384, 393-394 [toxic waste remediation]; *People v. Ozkan* (2004) 124 Cal.App.4th 1072, 1077 [costs of tax agency investigation]; *People v. Torres* (1997) 59 Cal.App.4th 1, 3 [costs of police agency investigation]; contra, *People v. Rugamas* (2001) 93 Cal.App.4th 518, 521-523 [medical costs of treating defendant not ordinary law enforcement cost]; *In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1134 [labor costs outside of regular duties]). The status of direct victim embraces concepts of both cause in fact and proximate cause. (*People v. Jones* (2010) 187 Cal.App.4th 418, 424-425.)

In renewing her argument on appeal, defendant trivializes the nature of the evidence of her participation in the attempted murder, and parses the attempted murder too abstractly from the shooting of Bodie. As noted above, there was evidence that she admitted encouraging Webb to make use of the gun he was carrying as they fled, which is more than sufficient to establish her as a substantial factor in the cause in fact of the subsequent shootings. While defendant vicariously committed the offense of attempted murder *against* the police officer—Webb firing two rounds in rapid succession at his

20

pursuers shortly after her encouragement of him to make use of his gun—Bodie was an *object* of the offense in the course of its commission. Defendant does not provide any basis for limiting the *object* of the offense only to the intended *victim* of the offense. If this were the case, a defendant would never be liable for restitution for any collateral damage caused in the course of an offense. Bodie's shooting was an event intimately connected with the offense's commission without any intervening factors, and thus the City was involved as a direct victim rather than simply as a third party or as a function of its ordinary operations. Consequently, the City was entitled to restitution.

### 4.2 Jury Findings Are Not Required to Support a Restitution Order

Relying on authority under which a jury must find beyond a reasonable doubt any fact that increases punishment beyond the maximum associated with a conviction (e.g., *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435]), which applies as well to criminal *fines* (*Southern Union Co. v. United States* (2012) 567 U.S. ___ [183 L.Ed.2d 318]), defendant contends the facts supporting the trial court's restitution order come within this principle and the order is consequently infirm for want of jury findings. We do not agree.

Restitution is a substitute remedy for crime victims, which relieves them of the need to file a separate civil action against a defendant. Because it does not represent an increase in *punishment* for the underlying convictions, jury findings are accordingly unnecessary. (*People v. Sweeney* (2014) 228 Cal.App.4th 142, 155; *People v. Pangan* (2013) 213 Cal.App.4th 574, 585; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184 [also noting substantial body of federal authority rejecting the argument]; cf. *People v. Millard* (2009) 175 Cal.App.4th 7, 35-36 [restitution as condition of probation].) Defendant acknowledges but disagrees with this authority, noting that our Supreme Court has not yet ruled on the issue. We will adhere to this uniform authority absent contrary direction from the Supreme Court.

## 4.3  Restitution Can Include Both Veterinary Costs and Replacement Costs

Relying on the statutory limitation on restitution for stolen or damaged property, defendant contends the trial court was required to award either the actual costs of "repair" of Bodie *or* the replacement cost for a new police dog, and could not cumulate these costs.  (§ 1202.4, subd. (f)(3)(A).)  This *extremely* abbreviated argument is untenable.

While Bodie himself is not entitled to restitution from defendant (*People v. Brunette* (2011) 194 Cal.App.4th 268, 278), he is nonetheless a living being, not an inanimate object for which an owner can be subjected to making the otherwise rational economic choice between "repair" and replacement.  Whether as a matter of general legislative policy promoting animal welfare, humanitarian principles, or general tort law principles regarding animal property (e.g., *Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 390-392 [also noting that animals are not treated under the law like other personal property]),[7] Bodie was entitled to medical care and, consequently, the City is entitled to recover those necessary costs (§ 1202.4, subd. (f)(3)(B)) in addition to the costs of obtaining a replacement for Bodie once it found that he was not capable of performing his police function any longer.

Under a different heading in her opening brief (and also for the first time in her reply brief under this heading), defendant suggests that restitution for Bodie's medical costs *and* the costs of replacement can be recovered *only* in connection with a conviction under section 600 for injury to a police dog, which unlike section 1202.4 makes express provision for this cumulative restitution remedy.  The cursory and belated nature of this argument forfeits our plenary consideration of it.  (*Sourcecorp, Inc. v. Shill* (2012)

---

[7] " ' "[A] plaintiff ought to recover for expenses reasonably incurred in efforts to cure [animals] . . . .  The law would be inhuman in the tendency if it should prescribe a different rule . . . since it would then offer an inducement to the owner to neglect [an animal's] sufferings." ' "  (*Kines v. Grosser* (2011) 195 Cal.App.4th 1556, 1562.)

206 Cal.App.4th 1054, 1061, fn. 7.)  It thus suffices for us to state in brief that the inclusion of this specific restitution provision in the course of choosing to criminalize the infliction of injury on police animals does not bespeak a legislative intent to abrogate recovery of both treatment costs and replacement value for animals in the general restitution statute.

## 5.0  Correction of the Abstract of Judgment

The abstract of judgment, even as recently amended in May 2014, incorrectly indicates the enhancement for personal use of a gun applies to the conviction for attempted murder rather than to defendant's conviction for reckless evasion of a police pursuit.  The trial court shall prepare a new amended abstract correcting this error.

### DISPOSITION

The judgment and subsequent restitution order are affirmed.  The trial court is directed to prepare a new amended abstract of judgment correcting the count to which the enhancement for personal gun use applies and forward a certified copy to the Department of Corrections and Rehabilitation.


                                                    BUTZ            , J.



We concur:



    NICHOLSON       , Acting P. J.



    HOCH           , J.


23