Filed 5/20/15  P. v. Schumacher CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C074062 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F7496) |
| v. | |
| ANTHONY LEE SCHUMACHER, | |
| Defendant and Appellant. | |

Sentenced to state prison pursuant to a plea bargain, defendant Anthony Lee Schumacher appeals from the trial court's order requiring him to pay $14,565.34 in victim restitution to William Byron.  Defendant contends that (1) absent a *Harvey* waiver (*People v. Harvey* (1979) 25 Cal.3d 754 (*Harvey*)), the evidence was insufficient to show that most of Byron's alleged loss was a result of the criminal acts of which defendant was convicted; (2) the trial court erred by ordering restitution for purchases Byron made for business entities that were not direct victims of defendant's crimes; (3) the trial court's erroneous evidentiary rulings prevented defendant from establishing that Byron did not personally incur the expense of those purchases; (4) this court should remand for a new hearing as to those items; and that (5) the trial court should decide on remand whether

1

any restitution award is subject to forfeiture based on Byron's probable use of the allegedly lost property in criminal narcotics activity. In support of the last contention, defendant requests we take judicial notice that on a date well after the victim restitution hearing, Byron was convicted of an out-of-state narcotics offense. Defendant also points out two errors in the sentencing minute orders.

Finding all of defendant's substantive contentions without merit, we affirm the victim restitution order and deny defendant's request for judicial notice. However, we remand the matter for correction of the sentencing minute orders.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Underlying Proceedings**

In October 2012, in case No. 12F7496, a felony complaint deemed an information charged defendant with shooting at an occupied motor vehicle (count 1; Pen. Code, § 246—undesignated statutory references are to the Penal Code) and assault with a firearm (count 2; § 245, subd. (a)(2)). An on-bail enhancement was alleged as to both counts. (§ 12022.1.)

On January 8, 2013, defendant pleaded no contest in case No. 12F7496 to assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), a related offense to that charged in count 2, after the People added that charge to the information as count 3. At the same time, in case No. 12F4251, defendant pleaded no contest to one count of assault by means of force likely to produce great bodily injury and two counts of assault with a machine gun or automatic weapon (§ 245, subd. (a)(3)), and in case No. 12F7497, defendant pleaded no contest to one count of possession for sale of a controlled substance (Health & Saf. Code, § 11379, subd. (a)). In return, defendant was promised an aggregate state prison sentence of 11 years eight months and the dismissal of all remaining counts and allegations. The plea agreement did not include a *Harvey* waiver.

On January 24, 2013, the trial court imposed the agreed-upon sentence. The prosecutor stated that the People were claiming $16,640 in victim restitution; defense

2

counsel demanded a restitution hearing. The court reserved jurisdiction to determine victim restitution and scheduled a future restitution hearing.

**Facts Supporting the Plea**

There was no preliminary hearing or probation report. The parties stipulated that the factual basis for defendant's pleas could be found in the police reports, which are not in the appellate record. However, the People presented the underlying facts in their motion to order restitution, and defendant agrees that the People's summary accurately represents the facts.

The motion states, in part: "Mr. Byron (Byron), the victim, lived with a woman named Peggy Schumacher, who is the defendant's . . . grandmother. Peggy allowed Byron to live on the property in his trailer and operate a marijuana grow. Three to four weeks prior to the incident that gave rise to the charges in this case, [defendant] moved into his grandmother's residence.

"Upon moving into the residence, [defendant] displayed aggressive behavior toward Byron and his friends. [Defendant] advised Byron that he didn't like the way one of Byron's friends looked at him and he wanted the friend off his grandmother's property. [Defendant] then produced a nine-millimeter handgun, shot a round into a tree, and then said, 'Do something about it.' At another time, [defendant] arrived at the property with five of his cousins. By the way they were acting Byron believed the subjects were going to start trouble. Fortunately, according to Byron, [defendant's] grandmother arrived and told [defendant] and his cousins to leave.

"Because of the menacing behavior of the defendant, on 9 October 2012 Byron began the process of moving off the property. While towing a trailer behind his vehicle in the area of Buenaventura Boulevard and Teton Drive, Byron heard a single gunshot. Byron immediately looked up and saw the defendant driving his Cadillac Escalade. [Defendant] had his left hand outside the driver's window and he was holding something. Byron heard approximately four more shots as he continued driving.

3

"When Byron reached a place of safety, he inspected his vehicles and noticed a bullet hole in the rear of the fifth wheel trailer he was towing. Also, a wheel on another vehicle being driven by a friend who followed was going flat. A bullet fragment was located inside the wheel. Law enforcement did not apprehend and capture [defendant] until 18 October 2012. Because [defendant] shot at him, Byron feared returning back to the residence to retrieve the remainder of his property."

**The People's Victim Restitution Claim**

The People asserted that the value of Byron's damaged or abandoned property was $16,640, mainly from items related to Byron's marijuana grow, which he left behind for fear of returning to the property while defendant was on the loose. The People attached receipts and a cover sheet furnished by Byron.

The cover sheet listed the following items:

| | |
|---|---:|
| Blueray [*sic*] | 119 |
| Tire | 207 |
| Fencing | 4006 |
| Fertilizer/pots/etc. | 91 |
| | 80 |
| | 294 |
| | 323 |
| FarmTek | 1486 |
| McConkey | 648 |
| [T]hrifty Supply | 5118 |
| Royl [*sic*] Gold | 919 |
| Royl [*sic*] Gold | 1200 |
| ShmidBaur [*sic*] [Building Supply] | 2149 |
| | 16640 |

A receipt for each item was attached. Most showed Byron as the buyer. However, the FarmTek receipt showed "Bill Byron [¶] The Herb Center Inc" as the buyer, the McConkey receipt showed "The Herb Center Inc." alone as the buyer, and the two Royal Gold receipts showed "Humboldt County Collective" and "Humboldt Co Collective" as the buyer.

**Defendant's Response**

On April 22, 2013, defendant filed attachments A through F in support of a request to continue the restitution hearing.[1]

Attachment A was described as "County of Humboldt, Board of Supervisors Recommendations with respect to 'Revocation of the Humboldt County Collective Conditional Use Permit,' dated 8/30/12." It purported to show: The Humboldt County Collective (THCC) was the county's first authorized medical cannabis collective. On April 6, 2012, county staff learned that Byron, THCC's director, had been arrested on drug trafficking charges in Pennsylvania. On June 7, 2012, Byron announced publicly that he was resigning as director and had turned over the operation and management of THCC to Collin and JoAnn Hammans. The Hammanses' subsequent financial report showed an unexplained operating loss, possibly linked to the criminal charges against Byron.

Attachment B was described as "News articles with respect to the arrest of Bill Byron for marijuana trafficking in Berks County, Pennsylvania, in April 2012." These articles alleged that the California Department of Justice closed THCC and served search warrants on the premises. Byron was accused of shipping a 25-pound package of marijuana, packaged for sale, to the Pennsylvania home of a friend he was visiting. If convicted, he faced a Pennsylvania prison sentence of up to five years.

Attachment C, the search warrant issued for THCC premises and Byron's person and vehicle, alleged that THCC was also known as The Herb Center, and the two businesses had the same address. The supporting affidavit alleged: Law enforcement officers intercepted a suspicious package at a FedEx facility on April 2, 2012. The

---

[1] Defendant's filing did not state the grounds on which the continuance was requested or make any argument of any kind. As will appear, the trial court did continue the hearing but did not cite defendant's filing.

address of the sender in California and the name of the recipient in Pennsylvania were fictitious. A trained drug-sniffing dog detected a narcotics odor coming from the parcel. The California authorities notified the Pennsylvania authorities, then let the package be shipped. After it was delivered, Pennsylvania police contacted the homeowner and Byron.

Attachment D, the return of search warrant, indicated that items including marijuana, firearms, and $14,380 in cash were found at Byron's residence.

Attachment E, labeled "Criminal Docket number CP-06-CR-0002103-2012, the Commonwealth of Pennsylvania v. William Charlie Byron, pages 1 through 5," purported to show that Byron was arraigned in Berks County, Pennsylvania, in May 2012 on multiple counts of attempted "Manufacture, Delivery, or Possession With Intent to Manufacture or Deliver" a controlled substance, and of conspiracy to do the same, and that a status hearing was scheduled in April 2013.

Attachment F, described as "Humboldt County Collective, correspondence from JoAnn [*sic*] Hammans, dated 10/9/12, detailing the transfer of ownership of the Humboldt County Collective, formerly The Herb Center, from William Byron to Collin and JoAnn Hammons [*sic*] in May 2012," stated that Byron had resigned from the collective as of May 25, 2012, and was not a member of the collective after that date.

**Further Proceedings**

At a hearing on April 22, 2013, the trial court ordered restitution in the amounts claimed for Byron's damaged Blu-ray disc player and tire ($207.54 and $119.99, respectively).[2] The court continued the restitution hearing because the prosecutor had said Byron was going to retrieve some of the other listed property in the near future.

---

[2] Defendant does not contest that order.

At the main victim restitution hearing on May 6, 2013, the prosecutor stated that Byron had retrieved some of the listed property and there had been an adjustment to the overall request. The court concluded that the amount currently at issue ("the prima facie amount") was $14,565.34.

Defense counsel called Byron as a witness and asked: "[W]ere you a business owner of a --[.]" The prosecutor objected that the question was irrelevant.

Counsel explained: "Your Honor, I simply want to put on the record . . . that Mr. Byron owned a business[;] that the number of these receipts reflect [*sic*] were purchases for the business; that he was no longer a part of this business at the time of this incident and when these losses were sustained. Moreover, I would want to put the fact of his arrest in Pennsylvania on the record."

The trial court ruled that counsel could inquire into "what was paid by a business [not owned in whole or in part by Byron] versus what was paid by Mr. Byron."

Byron testified that he was previously the owner of The Herb Center, which he called "a management company" that "managed a collective." Counsel asked: "Was The Herb Center not a marijuana collective in Humboldt County?" The trial court sustained the prosecutor's relevance objection.

Counsel asked Byron if "at some point you left your ownership or you sold your interest or you got out of ownership of that company . . . ?" Byron answered, "No." The trial court overruled the prosecutor's relevance objection.

Asked whether The Herb Center changed its name or became another type of business in April 2012, Byron answered, "No." Asked whether The Herb Center remained a business entity, Byron answered, "Yes."

Counsel asked: "What is the relationship between The Herb Center and The Humboldt County Collective?" The trial court initially sustained the prosecutor's relevance objection but changed its ruling after counsel pointed out the receipts showing THCC as the purchaser.

7

Counsel asked whether Byron had an interest in THCC; he answered, "Now? No." He said he had had such an interest "[a ]year ago"; he could not say exactly when it ended, but it did not end before October 9, 2012 (the date of defendant's crimes).

Counsel asked: "And what's [THCC]?" The trial court sustained the prosecutor's objection, stating that "the nature of [THCC]" was not relevant to "whether or not they paid a bill unrelated to money coming out of this person's pocket." The court also sustained objections to questions of whether Byron was paid a salary by The Herb Center or THCC.

Counsel argued: "Your Honor, this would go to if he's being compensated for his role in this business and if the funds . . . from the business are being --[.]" The trial court replied: "But we haven't established that the funds are coming from the business versus his pocket, which is what this testimony is relevant to. I don't care whether he's getting paid a salary or he is doing it for fun. The issue is, if we're looking at number 41, based on my ruling, is who paid $919.50? Where . . . did that money come from which was used to exchange for 9 yards of Bulk Mendo Mix and three somethings of Royal Gold Mix?"

Asked who paid for the $919 worth of Bulk Mendo Mix and Royal Gold Base Mix, Byron answered, "I did." Asked whether he paid for it "as a business expense or an investment in [THCC]," he answered, "No."

Asked about the source of the money for "the $1,200 worth of Royal Gold Mendo Mix," Byron replied that it came "[f]rom me" and was not a purchase made for the business or an investment in the business.

Asked why he had named THCC on the purchase receipts, Byron answered: "It's associated with my name. [¶] . . . [¶] . . . I'm attached to it. It's attached to me."

Counsel asked: "Is it your testimony, Mr. Byron, that you made these investments and the investments were not associated with [THCC]?" The trial court said: "I don't know what we mean by 'investments.' "

8

Counsel tried again: "You made these purchases that I have described of Bulk Mendo Mix and Royal Gold Mendo Mix. Were those . . . made for [THCC]?" Byron replied: "I already said I made those purchases."

Counsel asked: "You made those purchases and they were not associated in any way with [THCC]?" The trial court said: "No. They were. That's argumentative."

The trial court continued: "[L]let me ask a clarifying question. [¶] . . . [¶] . . . Did the money that you used come from your personal money or from some money of a business?" Byron answered, "Personal."

Counsel asked: "Now the purchase from FarmTek sold to Bill Byron of The Herb Center for . . . $1,486 . . . . [W]ith whose money was that payment made, your money or The Herb Center's money?" Byron answered, "My money." Asked, "And why is it listed as being sold to you The Herb Center [*sic*]?" Byron answered: "Again, associated with it."

Counsel asked: "How are you associated with The Herb Center?" The trial court sustained the prosecutor's objection, ruling the answer was irrelevant.

Counsel asked the same questions as to the purchase from McConkey's for $648, billed to The Herb Center. Again, Byron answered that he made the purchase with his own money and used The Herb Center's name because it "is associated with me."

Counsel asked: "And Mr. Byron, The Herb Center and [THCC], were those legal businesses?" The trial court sustained the prosecutor's relevance objection. Counsel asserted that "if there is an illegal business, . . . that fact may impact the lawfulness of the restitution order." The court repeated: "The objection is sustained." Counsel had no further questions or witnesses.

The trial court ordered victim restitution to Byron in the sum of $14,565.34.

## DISCUSSION

## I

We begin with an overview of the law of victim restitution.

9

"[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim . . . in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court." (§ 1202.4, subd. (f).)

To decide whether a victim's loss is the "result of the defendant's criminal conduct" (§ 1202.4, subd. (f)(3)), courts apply tort principles of causation, including cause in fact (whether the defendant's act was " 'a necessary antecedent of an event' ") and proximate cause (whether policy considerations make it appropriate to impose liability on the defendant). (*People v. Jones* (2010) 187 Cal.App.4th 418, 425-427 (*Jones*); accord, *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320-1321 (*Holmberg*).)

". . . California courts have adopted the 'substantial factor' test in analyzing proximate cause. [Citation.]" (*Holmberg*, *supra*, 195 Cal.App.4th at p. 1321.) This broad standard requires only that the contribution of any individual cause is more than negligible or theoretical, and that no intervening, superseding cause exists to relieve the defendant of liability. (*Id.* at p. 1321; *Jones*, *supra*, 187 Cal.App.4th at p. 427.)

"A defendant is entitled to a restitution hearing to 'dispute the determination of the amount of restitution.' (§ 1202.4, subd. (f)(1).) As recently explained, 'At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] "Once the . . . People have . . . made a prima facie showing of [the victim's] loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim." ' (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 [95 Cal.Rptr.3d 751] (*Millard*); see also [*People v.*] *Giordano* [(2007)] 42 Cal.4th [644,] 664 . . . .)" (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172 (*Chappelone*).)

We review the trial court's restitution order under the abuse of discretion standard. (*Chappelone*, *supra*, 183 Cal.App.4th at p. 1173.)  Where there is a factual and rational basis for the order under the substantial evidence standard, we will not find an abuse of discretion.  (*Millard*, *supra*, 175 Cal.App.4th at p. 26.)

**II**

Defendant contends:  "Absent a *Harvey* waiver, the trial court lacked authority to award restitution for Byron's abandoned property because the abandonment did not result from the criminal act of which [defendant] was convicted."[3]  This contention is forfeited because it was not raised below.  But even if not forfeited, it lacks merit.

Defendant attacked the People's prima facie case for victim restitution on two grounds in the trial court:  Byron was not entitled to restitution for the items supposedly purchased by The Herb Center or THCC, and he was not entitled to any restitution whatsoever because his acquisition or use of all the property at issue was somehow tainted by illegality.  But defendant never asserted until now that his own criminal conduct did not proximately cause Byron to abandon the property.  A party may not change his theory of the case on appeal.  (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29 (*North Coast Business Park*).)  Defendant's new and different theory is not properly before us.

Defendant asserts "the issue" is not forfeited for two reasons.  First, "[defendant's] argument is premised on the absence of evidence to support a restitution award on *any* ground[.]"  Second, trial counsel objected to restitution on "due process grounds," which

---

[3]  Defendant's original opening brief asserted that after defendant's arrest, Byron failed to return to the site where the abandoned property was and reclaim it; thus, he had "voluntarily abandoned" the property and could not obtain restitution for it.  However, on reading respondent's original brief, appellate counsel realized that Byron did return to the site and retrieve some of his property before the final restitution hearing.  Therefore, defendant's supplemental opening brief abandons this aspect of his abandonment claim.

"encompasses an objection based on insufficiency of the evidence because an order or judgment based on insufficient evidence violates due process." We are not persuaded.

The "issue" that is forfeited is not whether the victim suffered a compensable loss, but whether defendant's conduct proximately caused that loss. In any event, defendant does not show by record citation that he ever claimed below there was no evidence to support a restitution order on any ground.

Trial counsel's entire "due process" objection, on which defendant bootstraps his second argument, was this: "And [I] simply just object on due process grounds that [defendant] is going to be . . . ordered to pay this figure." Since counsel failed to explain why a restitution award would violate due process, this passing remark did not preserve any "issue."

Defendant asserts that if the issue is forfeited, he received ineffective assistance of counsel. Because defendant's new theory of the case lacks merit, as we now explain, trial counsel was not ineffective for failing to raise it.

Defendant reasons: (1) The People judicially admitted in their motion for restitution that Byron began to move off of defendant's grandmother's premises on October 9, 2012, because of defendant's menacing behavior several weeks earlier. (2) Therefore, "the cause in fact of Byron's losses were [*sic*] criminal acts for which no criminal charges were filed." Defendant's conclusion is a non sequitur.

The undisputed evidence shows that defendant's assault on Byron with a firearm on October 9, 2012, the criminal act defendant admitted by his plea, caused Byron in fact reasonably to fear returning to the premises to recover his property until defendant was apprehended nine days later, and during that period most of the property was irrecoverably lost. The evidence shows no intervening, superseding cause that would relieve defendant of liability for that consequence of his criminal conduct, and we know of no policy considerations that would do so. Thus, defendant's charged and admitted

12

criminal conduct was both the cause in fact and the proximate cause of Byron's losses. (*Holmberg*, *supra*, 195 Cal.App.4th at p. 1321; *Jones*, *supra*, 187 Cal.App.4th at p. 427.)

Last, we reject defendant's claim that the absence of a *Harvey* waiver somehow matters to this issue, because he does not cite any dismissed count that could have created liability for victim restitution had there been a *Harvey* waiver.

### III

Defendant contends Byron was not entitled to restitution for any purchases he made for THCC or The Herb Center because neither business was a direct victim of defendant's crime, and Byron's claim that he owned or was associated with those businesses does not assist him. Defendant also contends the trial court's evidentiary rulings improperly precluded him from rebutting the People's prima facie case as to those purchases, rendering the restitution hearing fundamentally unfair. We reject both contentions.

The trial court impliedly found that none of the purchases at issue was made by or for THCC or The Herb Center. Substantial evidence supports that finding. (*Millard*, *supra*, 175 Cal.App.4th at p. 26 [standard of review].)

When questioned about the receipts that showed THCC or The Herb Center as the nominal buyer, Byron answered that he paid for the items out of his personal funds. Defendant produced no contrary evidence.

Defendant also failed to corroborate his present claim that the items were used or intended for use by the businesses rather than by Byron himself. Byron's explanation that he used the businesses' names on the receipts because those names were associated with him was facially plausible and not rebutted by any defense evidence.[4]

---

[4] Byron's testimony that his "interest" in THCC did not end before October 9, 2012, although vague, created a potential conflict with assertions in defendant's attachments A and F that Byron resigned as director of THCC and was no longer a member after May

13

Defendant asserts that "being associated" with THCC "was an insufficient basis on which to award restitution to an individual (Byron), even if he claimed to be acting on the Collective's behalf" but cites no authority to support this legal proposition.

It is also unclear whether defendant ever argued in the trial court what he argues now. Trial counsel apparently sought to show that the businesses, not Byron, actually paid for the items at issue. That is a different proposition from defendant's appellate assertion that Byron made those purchases *for* the businesses. To the extent defendant seeks to change his theory of the case on appeal, his argument is not cognizable. (*North Coast Business Park*, *supra*, 17 Cal.App.4th at p. 29.)

Finally, we reject defendant's claim that the trial court improperly restricted his questioning of Byron. As we have shown above, the court allowed trial counsel to question Byron on the source of funds for the purchases bearing the businesses' names and the relationship between Byron and the businesses. What the court did not allow counsel to do was to inquire into the nature, character, or legality of the businesses. The court properly found that those inquiries could not produce any evidence relevant to whether Byron made the purchases at issue, and trial counsel did not explain why the legality of the businesses would matter to victim restitution. Defendant has shown no error in the court's evidentiary rulings.

## IV

Defendant contends this court should remand the matter to the trial court for a new hearing as to the items bearing the names THCC and The Herb Center. For the reasons stated above, remand for this purpose is unnecessary.

25, 2012. However, trial counsel did not make any such argument. And even if counsel had done so, that argument would not have rebutted Byron's testimony that THCC was "associated with my name" when he made the purchases that showed THCC as the buyer.

14

# V

Defendant contends that the trial court on remand should determine whether any restitution award is subject to forfeiture because Byron may have used the property at issue in connection with criminal narcotics activity, specifically a violation of Health and Safety Code section 11360 (transportation of marijuana) or a conspiracy to commit that offense (§ 182). He requests that we take judicial notice of a purported docket sheet that appears to show Byron pleaded guilty on April 22, 2014, in the Berks County (Pennsylvania) Court of Common Pleas to one count of conspiracy to manufacture, deliver, or possess with intent to deliver a controlled substance, based on events occurring in April 2012. (Pa. Stat. Ann., tit. 18, § 903, subd. (c) (Purdon 1998).) We reject defendant's contention. We also deny the request for judicial notice because defendant has not shown why Byron's purported out-of-state drug conviction, occurring well after the restitution hearing in this case, is relevant.

Defendant cites Health and Safety Code section 11470, which provides that items used in the commission of an offense involving controlled substances are subject to forfeiture once the state has proved such offense. (Health & Saf. Code, § 11470, subds. (b), (h).) But there was no evidence before the trial court, and there is none before this court, that Byron used any item for which he sought restitution in the commission of the purported Pennsylvania offense or any other offense involving controlled substances; defendant's contrary assertion is sheer speculation. Defendant also fails to cite any authority showing that the trial court on remand would have jurisdiction to initiate a forfeiture proceeding or inquiry sua sponte. (Cf. Health & Saf. Code, § 11488.4, subd. (a) [forfeiture commences by petition filed by Attorney General or district attorney of county in which defendant charged with underlying criminal offense].)

On direct appeal, we generally consider only matters that were part of the record when the judgment was entered. (*People v. Jacinto* (2010) 49 Cal.4th 263, 272, fn. 5.)

Defendant's speculation gives us no grounds to depart from that rule. On the record before us, we will not direct the trial court to consider any matter related to forfeiture.

## VI

Defendant points out two errors in the sentencing minute orders. The Attorney General properly concedes the errors.

First, the sentencing minute order of January 24, 2013, erroneously states that the trial court ordered restitution to Byron in the amount of $16,640 in case No. 12F7496. The minute order should be corrected to show that the court reserved jurisdiction over victim restitution on January 24, 2013.

Second, the sentencing minute order of May 6, 2013, erroneously states (1) the parties had said no hearing was necessary, as an agreement had been reached, and (2) restitution had been ordered in the amount of $14,565.34 in case No. *12F7497*. In fact, as noted above, the parties agreed only on the previously stipulated award of $327.53 in case No. 12F7496, and on the reduction of the remaining restitution claim *in the same case* to $14,565.34. The minute order should be corrected to show that, after a hearing, the trial court ordered further restitution in case No. 12F7496 in the amount of $14,565.34.

## DISPOSITION

The victim restitution order is affirmed. The matter is remanded to the trial court with directions to correct the minute orders of January 24, 2013, and May 6, 2013, as set forth in part VI of the Discussion.

                                                        RAYE            , P. J.

We concur:


        MURRAY        , J.


        HOCH          , J.

16